FILED

1  BRODSKY & SMITH, LLC
   Evan J. Smith (SBN 242352)
2  9595 Wilshire Blvd., Ste. 900
   Beverly Hills, CA 90212
3  Tel.: (310) 300-8425
   Fax: (310) 247-0160
4  esmith@brodsky-smith.com

2009 MAR 10  PM 3: 12

CLERK U.S. DISTRICT COURT
CENTRAL DIST. C  CALIF
LOS ANGELES

BY_____

5  Attorneys for Plaintiffs

6  [Additional Counsel Appear on
   Signature Page]
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10  DEMETRICE LEDBETTER, III,                § EDCV09-0507 VAP (CTx)
    derivatively on behalf of the Nominal    §
11  Defendant Basin Water, Inc.,             § CIVIL ACTION NO.
                                             §
12                                           §
              Plaintiff,                     §
13                                           §
    v.                                       §
14                                           §
    PETER L. JENSEN, MICHAEL M.              §
15  STARK, THOMAS C. TEKULVE,                §
    KEITH R. SOLAR, VICTOR J.                §
16  FRYLING, RUSSELL C. BALL, III,           §   JURY TRIAL DEMANDED
    ROGER S. FAUBEL, SCOTT A.                §
17  KATZMANN, AND STEPHEN A.                 §
    SHARPE                                   §
18  and                                      §
                                             §
19  BASIN WATER, INC.                        §
                                             §
20            Defendants.                    §
                                             §
21                                           §
22
23          **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**
24
          Plaintiff Demetrice Ledbetter ("Ledbetter" or "Plaintiff") by his attorneys
25
26  submits this Verified Shareholder Derivative Complaint (the "Complaint") against

    Defendants named herein.

                                    - 1 -
    _____

## NATURE OF THE ACTION

1.        This is a shareholder action brought for the benefit of Nominal Defendant, Basin Water, Inc. ("Basin Water" or the "Company"), against Peter L. Jensen ("Jensen"), Michael M. Stark ("Stark"), Thomas C. Tekulve ("Tekulve"), Keith R. Solar ("Solar"), Victor J. Fryling ("Fryling"), Russell C. Ball, III ("Ball"), Roger S. Faubel ("Faubel"), Scott A. Katzmann ("Katzmann") and Stephen A. Sharpe ("Sharpe")  (collectively referenced to herein as "Individual Defendants") for breaches of their fiduciary duties owed to the Company during the Relevant Period, November 14, 2006 through the present[1] (the "Relevant Period").

## JURISDICTION AND VENUE

2.        This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000 exclusive of interest and costs.

3.        This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would otherwise not have.

4.        Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein occurred in this district.  Defendants either reside in or maintain executive offices or participated in board meetings in

---

[1] Because Individual Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred between at least November 14, 2006 and August 8, 2008, the Relevant Period continues through this day instead of ceasing on August 8, 2008, the day the public became aware of the wrongdoings at the Company.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

this district and have received substantial compensation in this district by engaging in numerous activities and conducting business here.

## THE PARTIES

5.      Plaintiff Demetrice Ledbetter ("Plaintiff") is, and was at the time the transactions for which he complains occurred, a shareholder of nominal defendant Basin Water.  He is a citizen of Arizona.

6.      Nominal Defendant Basin Water is a Delaware corporation with its headquarters in Rancho Cucamonga, California.   Basin designs, builds and implements systems for the treatment of contaminated groundwater. The Company has developed an ion exchange treatment system that reduces groundwater contaminant levels. Basin markets its system to utilities, cities, municipalities, special districts, real estate developers and other organizations that supply water, collectively referred to as water providers, for use in treating groundwater sources.

7.      Peter L. Jensen ("Jensen") is a citizen of the State of California, and was at all times relevant hereto the Chairman of the Company's Board and Chief Executive Officer of the Company.  He retired on February 19, 2008.

8.      Jensen was Basin's CEO and Chairman of the Board during the Relevant Period until February 19, 2008 when he retired. Jensen remained a member of the Board of Directors throughout the Relevant Period. Jensen exercised a significant degree of day-to-day control over the Company. Jensen was also at all

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

relevant times Basin's Chairman of the Board from November 2006 until his resignation in 2008. Jensen was Basin's President from December 1999 to October 2006. Jensen was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein and was aware of, or recklessly disregarded, the false and misleading nature of the Company's statements and information. By reason of his positions, Jensen had access to material inside information about Basin and was able to, and did, control directly or indirectly the acts of Basin and the contents of the representations disseminated by, or in the name of, Basin. The statements made and/or approved by Jensen as alleged herein are indicative of Jensen's degree of operational control over Basin, amounting to the power to control, and the personal knowledge of, the Company's operations. Additionally, Jensen signed the Company's Form 10-Qs and 10-Ks during his time as CEO. Jensen was also involved in the negotiations for Basin's WSAs, as well as Basin's negotiations with Shaw and signed agreements with Shaw on Basin's behalf.

9.      In 2006, Jensen received a salary of $152,344, a bonus of $127,385, stock awards of $28,188, and other compensation totaling $43,875, for a total of $351,792. In 2007, Jensen received a salary of $269,550, a bonus of $83,000, stock awards of $45,088, and other compensation totaling $24,078, for a total of $421,716. In May 2007, the Compensation Committee of Basin's Board of

- 4 -

Directors ("Compensation Committee") increased the base salary for Jensen from $168,750 to $330,000. After reviewing the Company's financial performance in December 2007, the Compensation Committee awarded Jensen a discretionary bonus of $83,000. On December 28, 2007, the Compensation Committee approved the grant of stock options to Jensen for 55,000 shares, which vest one-third on each of the first, second and third anniversaries of the grant date. Also in 2007, Basin provided reimbursement to Jensen for Company vehicle use, office lease payments, spouse travel and other expenses in the amount of $24,078. In connection with Jensen's resignation as CEO and Chairman on February 19, 2008, Basin entered into an Employment Transition and Consulting Agreement with Jensen. Under this agreement, Jensen received: (a) a cash lump sum payment of $422,797; (b) payment for healthcare insurance for 18-months following the separation date (or until he accepts employment with another employer providing comparable benefits); (c) retention as a consultant to Basin for 2 years after the separation date for which Jensen will receive $200,000 per year (payable each year in 12 equal monthly installments); (d) compensation for services as a director; and (e) retention of all Basin personal property, including computer equipment, printers, cameras and a used Company truck. As of March 31, 2008, Jensen owned 2,365,982 shares of common stock, which amounted to 10.78% of the common stock outstanding. Additionally, during the Relevant Period, Jensen reaped over $1.8 million in insider

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

trading proceeds by selling 180,000 shares of his Basin stock at artificially inflated prices.

10.     Jensen has over 25 years experience in the water and natural resources industries. Jensen currently serves as CEO and Chairman of the Board of Directors of Empire Water. Jensen is a registered professional engineer in California, and holds a B.S. and M.S. in chemical engineering from the Massachusetts Institute of Technology. From 1990 to 1999, Jensen served as Chairman of the Board of Directors of Western Water Company, a company engaged in the identification, development, transportation, sale and lease of water rights and water. From 1990 to 1997, he also served as President and CEO of Western Water Company. From 1989 to 1990, he served as Chairman of the Board of Directors of Yuba Natural Resources, Inc. ("Yuba"). From 1983 to 1990, Jensen served as a President of Yuba.

11.     Jensen's long-lasting ties and dealings in the water industry are extensive and involve numerous entities, including, but not limited to, Western Water, Basin and Empire Water. Until 1990, Western Water was a subsidiary of Yuba, a faltering minerals-mining company. From 1983 to 1989, Jensen served as Yuba's President and, from 1989 to 1990, served as Yuba's Chairman of the Board of Directors. After an investigation by the Federal Bureau of Investigation, a portion of Yuba was spun off into YG Development, which subsequently became

- 6 -

Western Water.[2] Katzmann, the current Chairman of the Board of Directors at Basin, was a former director at Western Water. On May 24, 2005, Western Water filed for bankruptcy and continues to operate as a debtor-in-possession.[3]

12.    Michael M. Stark ("Stark"), is a citizen of the State of California, and was President and COO of Basin from October 2006 until February 19, 2008, when he took over for Jensen as CEO.

13.    Stark was President and COO of Basin from October 2006 until February 19, 2008, when he took over for Jensen as CEO. Stark additionally was appointed as a Class I Board Member on May 27, 2008. Stark exercised a significant degree of day-to-day control over the Company. Stark was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein and was aware of, or recklessly disregarded, the false and misleading nature of the Company's statements and information. By reason of his positions, Stark had access to material inside information about Basin and was able to, and did, control directly or indirectly the acts of Basin and the contents of the representations disseminated by, or in the name of, Basin. The statements made and/or approved by Stark as alleged herein

---

[2] http://query.nytimes.com/gst/fullpage.html?res=9905EEDE1230F937A2575BC 0A962958260

[3] Roger S. Faubel ("Faubel"), who joined Western Water in June 1997, and became VP in February 1998, has also served as a Basin director. Faubel's public affairs consulting firm – Roger Faubel Public Affairs, Inc. – shares the same business address in Lake Forest, California, as Empire Water, the company for whom Jensen currently serves as CEO and Chairman. Additionally, Larry W. Rowe ("Rowe"), who served as VP-Water Management of Western Water, currently serves as President and COO of Empire Water, and was Basin's VP of

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

are indicative of Stark's degree of operational control over Basin, amounting to the power to control the Company's operations. Additionally, Stark signed the Company's Form 10-Qs and 10-Ks following Jensen's retirement from the positions of CEO and Chairman in February 2008.

14.     In 2006, Stark received a salary of $63,356, stock awards of $92,777, option awards of $19,104, and other compensation totaling $6,345, for a total of $181,582. In 2007, Stark received a salary of $325,842, a bonus of $80,000, stock awards of $556,676, option awards of $114,624, and other compensation totaling $41,864, for a total of $1,119,006. In October 2006, Basin granted Stark a restricted stock award of 200,000 shares of the Company's common stock, as to which one-third of the shares would vest on each of the first, second and third anniversaries of the grant date. The stock options awarded to Stark upon his employment in 2006 vest when Basin's stock price reaches certain levels: 100,000 shares vest upon the Company's stock price reaching and staying at or above $15.25 for at least 45 consecutive days within 3 years from the grant date; 100,000 shares vest upon the Company's stock price reaching and staying at or above $19.00 for at least 45 consecutive days within 3 years from the grant date; and 100,000 shares vest upon the Company's stock price reaching and staying at or above $23.50 for at least 45 consecutive days within 4 years from the grant date. On October 25, 2007, Basin hired Stark to become the Director of Sales for Industrial Operations.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

Operations at an annual salary of $140,000. After reviewing the Company's financial performance in December 2007, the Compensation Committee awarded Stark a discretionary bonus of $80,000. Additionally, pursuant to Stark's employment agreement with the Company, Stark was eligible to receive an annual cash bonus equal to between 15% and 75% of his base salary depending on whether the Company meets certain annual targeted revenue and net income targets. On December 28, 2007, the Compensation Committee approved the grant of stock options to Stark for 50,000 shares, which vest one-third on each of the first, second and third anniversaries of the grant date. As of March 31, 2008, Stark owned 200,000 shares of common stock.

15.     Stark has extensive experience in the water industry. Stark served from 1997 to 2005 as President of Veolia Water North America, previously known as USFilter, a water services company. From 2005 to 2006, Stark served as an independent consultant to companies in the water industry. From 1992 to 1997, Stark served as President and CEO of Mobley Environmental Services, Inc., a company specializing in non-hazardous hydrocarbon recycling. Prior to that time, Stark held executive positions at a variety of companies, and has been employed in the water, environmental and specialty chemical industry since 1965. Stark holds a B.S. in Biology from Marietta College.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

16.     Thomas C. Tekulve ("Tekulve"), is a citizen of the State of California, and was at all times relevant hereto CFO, Treasurer and Chief Administrative Officer of Basin.

17.     Tekulve is, and at all relevant times was, CFO, Treasurer and Chief Administrative Officer of Basin since October 2004. Tekulve exercised a significant degree of day-to-day control over the Company. Tekulve was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein and was aware of, or recklessly disregarded, the false and misleading nature of the Company's statements and information. By reason of his positions, Tekulve had access to material inside information about Basin and was able to, and did, control directly or indirectly the acts of Basin and the contents of the representations disseminated by, or in the name of, Basin. Additionally, the statements made and/or approved by Tekulve as alleged herein are indicative of Tekulve's degree of operational control over Basin, amounting to the power to control the Company's operations. Tekulve oversaw the implementation and operation of internal financial controls at Basin and signed WSAs on be half of Basin.

18.     In 2006, Tekulve received a salary of $143,406, a bonus of $100,000, stock awards of $15,867 and option awards of $154,512, for a total of $413,785. In 2007, Tekulve received a salary of $181,738, a bonus of $50,000,

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

stock awards of $25,376, option awards of $50,525, and other compensation totaling $1,812, for a total of $309,451. During 2006, Basin granted Tekulve an option to purchase 1.5% of the shares of the Company's subsidiary, BionBasin, Inc. In May 2007, Basin increased the base salary for Tekulve from $151,250 to $200,000. After reviewing the Company's financial performance in December 2007, the Compensation Committee awarded Tekulve a discretionary bonus of $50,000. In March 2007, the Compensation Committee also awarded a one-time cash bonus of $100,000 to Tekulve purportedly in recognition of the efforts he made in connection with the Company's IPO and allegedly in light of his below-market base salary compensation. On December 28, 2007, the Compensation Committee approved the grant of stock options to Tekulve for 29,000 shares, which vest one-third on each of the first, second and third anniversaries of the grant date. As of March 31, 2008, Tekulve owned 224,875 shares of common stock.

19.     Tekulve has extensive experience in the water industry and in financial reporting. Tekulve was additionally appointed as Basin's Secretary in February 2006. From January 1999 to September 2004, Tekulve served as Vice President ("VP") of Finance and Treasurer of Southwest Water Company, a company engaged in the business of water production and distribution, wastewater collection and treatment, public works services and utility submetering. From 1995 to 1998, he served as CFO of SafeGuard Health Enterprises, Inc., a provider of

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

dental and vision care benefit programs. From 1984 to 1994, Tekulve served in a variety of executive positions at Beckman Coulter, Inc., including as Director of International Finance. Tekulve is a certified public accountant and holds an MBA from Portland State University and a B.S. in accounting from California State University, Northridge.

20.     Keith R. Solar ("Solar") is a citizen of the State of California, and was at all times relevant hereto a member of the Board of Directors of Basin and was Chairperson of the Board's Compensation and Nominating and Governance Committees.

21.     Victor J. Fryling ("Fryling") is a citizen of the State of Florida, and was at all times relevant hereto a member of the Board of Directors of Basin and was Chairperson of the Board's Audit Committee and member of the Compensation Committee.

22.     Russell C. Ball, III ("Ball") is a citizen of the Commonwealth of Pennsylvania, and was at all times relevant hereto a member of the Board of Directors of Basin and a member of the Board's Audit and Nominating and Governance Committees.

23.     Roger S. Faubel ("Faubel") is a citizen of the State of California, and was at all times relevant hereto a member of the Board of Directors of Basin

and a member of the Board's Compensation and Nominating and Governance Committees.

24.     Scott A. Katzmann ("Katzmann") is a citizen of the State of California, and was at all times relevant hereto a member of the Board of Directors of Basin and a member of the Board's Audit, Compensation and Nominating and Governance Committees.

25.     Stephen A. Sharpe ("Sharpe") is a citizen of the State of Florida, and was at all times relevant hereto a member of the Board of Directors of Basin and a member of the Board's Audit Committee.

26.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Basin Water's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group published" information, the result of the collective actions of the Individual Defendants and should also be deemed "control persons" of the Company.

## **<u>SUMMARY OF THE ACTION</u>**

27.     Founded in 1999, Basin designs, builds, implements, maintains and services systems for the treatment of contaminated groundwater. Basin's customers consist of large and small water districts and both publicly traded and privately owned water companies, including some of the nation's largest publicly traded water utilities, including American Water Works Co., Inc., and some of the nation's largest municipal agencies, including the Coachella Valley Water District ("Coachella"). Basin's customers have the option of either buying a water treatment system outright or they can sign a long-term lease agreement, generally ranging from 5-10 years, with an option to purchase at the end of the lease. Purchasers and lessees both have the option of signing a long-term operation and maintenance contract, or WSA that includes waste disposal services.

28.     As part of their effort to boost the price of Basin's stock, defendants misrepresented Basin's true prospects and concealed Basin's improper acts until they were able to: (a) sell more than $2.9 million worth of their own Basin stock; and (b) complete a $12.5 million acquisition of another company, 40% of which

consisted of the Company's inflated stock. Basin has now admitted that it may be necessary to restate the Company's previously issued financial statements as a result of the Company's revenue recognition for certain transactions.

29.     Defendants made false and misleading statements concerning the status of long-term legacy water services agreements/contracts ("WSA" or "WSA legacy contracts") that defendants knew, or were extremely reckless in not knowing, were false and/or misleading causing the Company's shares to be inflated.

30.     In order to materially overstate Basin's revenues and operating cash flows and materially understate its expenses and losses, defendants also caused Basin to violate Generally Accepted Accounting Principles ("GAAP") and SEC guidance, including the following: (a) Basin improperly recognized revenue in connection with a transaction with Shaw Environmental and Infrastructure, Inc. ("Shaw"), which overstated net revenue by $2.5 million in 2006 and $0.2 million post-2006; (b) Basin prematurely recognized $3.4 million in revenue and $500,000 in net income from a long-term finance agreement – funded by Basin – with a new customer; (c) In connection with its financing of 10 water treatment systems that Basin operated for other third parties, Basin falsely reported on its statement of cash flows that the source of its $3.4 million in negative cash flow was Basin's investing activities rather than its operating activities;[4] (d) Basin failed to disclose material

---

[4] Basin admitted this $3.4 million cash flow error by improperly reversing the effects of the error in its 2007 year end financial statements. Basin did this to avoid restating its false 2Q07 and 3Q07 financial statements, which was required by GAAP and SEC regulations.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

contingent liabilities with respect to large WSAs, although the Company's WSAs had incurred substantial operating losses prior to and during the Relevant Period. Defendants subsequently revealed that Basin had taken a $5 million expense charge to account for previously undisclosed losses under these contracts; (e) Basin improperly recognized net revenue of approximately $2.5 million in connection with a transaction with Shaw; and (f) In addition, Basin violated numerous GAAP and SEC disclosure requirements that helped conceal related and relevant facts.

31.     In May of 2006, Basin went public, raising over $75 million in the IPO. Despite entering into loss-leader, money losing contracts, the Company's offering documents specifically stated that each of Basin's long-term WSAs "allow [the Company] to recover increased operating costs, including costs for salt, resin and removal of waste."[5]

32.     In defendants' rush to go public and raise tens of millions of dollars, defendants knowingly, or with extreme recklessness, did not disclose to investors that Basin entered into contracts that were unprofitable and specifically did not allow Basin to recover increased operating costs, including costs for salt, resin and removal/disposal of waste. However, despite representations that its long-term contracts did contain such terms, Basin later stated on March 29, 2007, that

---

[5] During an August 14, 2006 conference call, Jensen stated that "[the Company has] cost protection, which will reduce the impact of these costs over the next several quarters," and in a November 14, 2006 conference call, reiterated that "[Basin has] cost protection clauses in **most** of our contracts."

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

"[w]e have cost protection clauses on all but our old lease contracts." On April 2, 2007, the Company clarified that only "[c]ertain of our long-term contracts allow us to recover increased operating costs, including costs for salt, resin and removal of waste. Most of our contracts entered into prior to 2005 do not have such provisions." Basin disclosed that it needed to record a reserve in 4Q06 (the "4Q06 Reserve") mere months after the Company was taken public in part on the strength of its WSAs. Stark described the state of affairs at Basin in the period prior to his joining the Company as a "freaking disaster" and that Jensen "didn't understand inventory, long term contracts and pass-throughs" or "anything about business systems."[6]

33.     Despite the problematic contract terms, following the release of Basin's 2006 results, Stark specifically reassured investors in a March 29, 2007 analyst conference call that early in 4Q06 Basin "began a review of all of our water service agreements [and] established a profit and loss statement for each [ ] WSA, Water Service Agreement," "established [ ] a P&L for each WSA," and "identified [ ] the loss contracts." Stark added that the "reserve we've taken is to eliminate the loss," indicating that the Company had adequately reserved for problematic WSAs. Stark specifically represented that Basin was "accounting for it all correctly." Defendants failed to disclose that they inadequately reserved for contracts that

_____

[6] Stark has also stated that "[Jensen] didn't understand that in a service contract, anybody in the service business knows there have to be certain passthroughs on things we don't control and they don't control. . . . They didn't understand any of that so, consequently, every one of their systems

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

lacked passthrough provisions for wells that defendants knew had yet to go online or were not yet operational and would incur large losses. Defendants failed to disclose that they did not have operating results for legacy systems that would not become operational until the summer of 2007 – a fact necessary in order to truthfully state that Basin had "reached the end of the legacy [WSA] issues." Defendants also failed to include in Basin's reserve material losses that would be incurred from certain significant WSAs, including contracts with Coachella and the Baldy Mesa Water District ("Baldy Mesa"). Thus, although defendants informed the market that Basin had addressed the WSA legacy contract issues – including contracts dating prior to the IPO – and had put the problem behind them, the truth was that the Company was facing extreme losses from the WSA legacy contract issue – losses greater than the 4Q06 Reserve. These statements were false and misleading because they did not include all significant WSAs, including two of the Company's most significant WSAs, Coachella and Baldy Mesa.

34.     On May 14, 2007, the Company reported increased revenues and again reassured the market that it had "all the tools in place" to turn into a profitable company in the second half of 2007. In addition, following its stated 4Q06 review of each WSA, the Company represented to investors that it had resolved the issue of the WSA legacy contracts by reversing a portion of the reserve it had announced only a quarter previously. Stark stated that he remained committed to the view that

worked – but they were terribly priced and terribly contracted."

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

Basin would "slip into profitability in the third and fourth quarters of 2007." In addition, confirming that the WSA legacy contract issue was behind them, Stark stated that "[w]e're not seeing any significant upward pressure from our treaters or from our salt vendors. . . . And we expect, actually, to see an overall decrease in our cost of residual management and salt purchases." On May 21, 2007, an analyst from A.G. Edwards & Sons, Inc. ("Edwards") commented that "management reviewed and projected profits and losses for each water service agreement and wrote-off the projected losses" and, on June 26, 2007, an analyst with Nollenberger Capital Partners ("Nollenberger") commented that "[t]he [C]ompany completed a review of all its contracts in 1Q07."

35.     On September 17, 2007, Basin announced the $12.5 million acquisition of Mobile Process Technology, Co. ("MPT"), which was funded in part by $5.3 million of the Company's own stock as currency which was inflated based upon defendants' representations.[7]

36.     On November 14, 2007, before the market opened, the Company reported its financial results for 3Q07, and partially disclosed Basin's true financial condition. Basin announced that during 3Q07, the Company had a $9.9 million loss, and that the Company recorded a $5 million charge to cost of revenues to reserve

---

[7] Following the acquisition of MPT, Basin went from employing 65 full-time employees as of December 31, 2006 to 107 full-time and 5 part-time employees at the end of December 31, 2007.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

for future projected losses.[8] The reserve was due primarily to the poorly priced WSA legacy contracts, increasing waste disposal and salt purchase costs and the inability to contractually pass increased costs on to the Company's clients. This charge to cost of revenues was in addition to the 4Q06 Reserve.

37.     With Basin's announcement of its 3Q07 financial results, defendants simultaneously released overtly positive false statements that Basin would be profitable in 4Q07 and all of 2008. Although Basin's share price fell, not all of the artificial inflation had dissipated from Basin's share price. Moreover, the positive statements defendants made at the November 14, 2007 analyst conference call included statements relating to Basin's alliance with Rohm and Haas Chemicals LLC ("Rohm and Haas") that resulted in certain analysts viewing Basin as a company on the right track and with only tepid reactions to the additional reserve.[9] Stark specifically was upbeat and stated that he "consider[ed] it the completion of

---

[8] Contrary to defendants' statements claiming the reserve for cost of revenues on the WSA legacy contracts was for $4.7 million, Basin's Form 10-K for the period ending December 31, 2007, indicates that the reserve was actually for $5 million.

[9] Defendants' statements relating to the initial reserve were incomplete because specific problematic WSA legacy contracts would become operational in the summer of 2007. In an analyst conference call following the November 14, 2007 announcement, defendants claimed that it was additional older WSA legacy contracts becoming operational in the "busy high volume summer months" of 2007, that caused the Company to take a further reserve. Claiming that the issue was behind Basin, Stark stated that the WSA legacy contract issue was "not that complex," "[n]one of us think it's a mystery" and that Basin "did not have the P&L for every well," and did not "have the data amassed" for the WSA legacy contracts. In fact, according to Stark, "the data we had was, in many cases, anecdotal." Tekulve also admitted that the 3Q07 Reserve was partially for old WSA legacy contracts that had just come online and which had not been included in the 4Q06 Reserve: "[The 3Q07 Reserve] were all old contracts, some of which we had already reserved for in the prior year which had a greater loss. Some were contracts that were in place in the prior year but didn't come on line and begin operating until this year." Until this time, defendants had maintained that all of the WSA legacy contracts had been included in the calculation of the 4Q06 Reserve, not merely the WSA legacy contracts that were operational at the time.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

the first half of Basin's transition. It is our view that all of our early contracts are now accounted for and we can move forward." Certain analysts rated the stock "neutral" and did not downgrade the stock, accepting that Basin's WSA issues were behind the Company.

38.     The positive news announced by defendants at the time of the 3Q07 Reserve was that Basin would be profitable in 4Q07 and for calendar year 2008. Moreover, as Basin stated, "all of our early contracts are accounted for." These positive statements resulted in Basin's stock to continue to trade at artificially inflated levels, even though the announcement of the 4Q07 Reserve partially disclosed to the market the truth about whether defendants had in fact "gotten our arms around the legacy issues with the 3Q07 Reserve." Following such positive news, one analyst characterized the 4Q07 Reserve as merely a "hiccup" "on the way to achieving $1 billion of largely recurring revenue within ten years."

39.     In February of 2008, based upon conversations with Basin management, analysts continued to remain upbeat after the release of the news of Basin's Empire Water transaction and claimed "clear strides have been made in terms of sales force quality, contract pricing, process and cost controls, along with core administrative/financial systems. . . . [Stark] appears to have cleared-out much of the earlier infrastructure inadequacies within the company and gives us a good

- 21 -

measure of confidence that the 'heavy lifting' is indeed concluded internally, sooner than our expectations."

40.     Basin again reassured the market that any of its previous revenue issues were in the past during the 1Q08 earnings conference call on March 17, 2008. Specifically, defendants stated that analysts' estimates that the Company would achieve revenues of $26 million to $36 million for fiscal year 2008 were not unreasonable.

41.     During an interview conducted at the American Water Works Association's Annual Convention and Exposition held in Atlanta, Georgia from June 8-12, 2008, Stark stated "I wish we weren't public. I wish we were still private. And the reason I say that is because it costs you so much money to be public with Sarbanes-Oxley and dealing with investors and having to do the audits the way you have to do it."

42.     On August 11, 2008, little more than five months after reassuring the market that the Company could achieve revenues of $26 million to $36 million in 2008, the Company unexpectedly and shockingly announced that ". . . the Company believes that it may be necessary to restate previously issued financial statements for certain periods as a result of the Company's revenue recognition relating to certain specific transactions." The Company further stated that it would not release its quarterly report on Form 10-Q for the quarter ended June 30, 2008,

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

and canceled the scheduled conference call with investors. Then on August 20, 2008, Basin announced that it faced being delisted by NASDAQ on August 25, 2008 because the Company's Form 10-Q for the quarter ended June 30, 2008 remained unfiled.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

43.     Defendants are liable for: (a) making false statements; or (b) failing to disclose adverse facts known to them about Basin. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Basin common stock was a success, as it: (i) deceived the investing public regarding Basin's prospects and business; (ii) artificially inflated the price of Basin's common stock; (iii) allowed Individual Defendants Jensen, Tekulve and Stark to obtain larger bonuses which were tied to the performance of Basin; (iv) allowed Jensen to sell $2.9 million worth of his own Basin shares; and (v) allowed the Company to make an acquisition using, in part, inflated Basin shares.

44.     Defendants created the false impression that Basin had properly recognized revenue from Shaw and that all contracts that were poorly priced or did not contain pass-through of cost terms had been included in the 4Q06 Reserve – a much different state of affairs than what actually existed. Moreover, Individual Defendants knew or were reckless in not knowing that the WSA legacy contracts going online in 2007 were poorly priced and would not be profitable. By failing to

disclose material facts to investors, defendants created an impression of a state of affairs that differed in a material way from the one that actually existed.

45.     Defendants did not disclose to investors that Basin entered into contracts that were unprofitable and which specifically did not allow Basin to recover increased operating costs, including costs for salt, resin and removal/disposal of waste. Despite representations that each of its long-term contracts did contain such terms, Basin later disclosed on March 29, 2007, that "[w]e have cost protection clauses on all but our old lease contracts." On April 2, 2007, the Company clarified that only "[c]ertain of our long-term contracts allow us to recover increased operating costs, including costs for salt, resin and removal of waste. Most of our contracts entered into prior to 2005 do not have such provisions." Basin disclosed that it needed to record a reserve in 4Q06, mere months after the Company was taken public in part on the strength of its WSAs:

> However, unlike [the Company's] more recent contracts, these older contracts do not allow Management to renegotiate the terms to recover such increased costs. Management has determined that these contracts will continue to generate net operating cash flow losses through the end of the contract period. Accordingly, [the Company] recorded a reserve for future contract losses in the amount of $3.7 million in the fourth quarter of 2006. This amount represents the losses which [Management] expects to incur during the remaining term of these contracts.

46.     Despite these partial disclosures, defendants failed to reveal the specific number of affected contracts, the length or term of the contracts, the specific parties involved and value of those contracts. Significantly, defendants did not reveal the impact the problematic contracts would have on Basin. For instance,

- 24 -

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

defendants did not reveal a need for an impending reserve. These omissions made even the partial disclosures misleading.

47.     Additionally, defendants accompanied these partial disclosures with positive statements about the Company (including their relationship with Shaw – which revenue was also ultimately revealed to be overstated).

48.     On August 14, 2007, the Company announced its 2Q07 results and again asserted that Basin had "completed the transition efforts." Stark, during a conference call following the release of Basin's 2Q07 results, continued to confirm his prior representations relating to the 3Q06 Reserve when he stated that "[Basin has] finally reached the end of the legacy issues" and pointed to the partial reversal of the prior reserves for the legacy contracts. Stark added that "we took a reserve that zeroed out the losses." Stark also stated that "we have gotten our arms around the legacy issues" and that "[Basin] will definitely be profitable in the fourth quarter." Based on representations from Basin, analysts noted that "the bulk of the issues with the legacy contracts have been resolved." These statements were false and misleading as defendants had not in fact analyzed all of the Company's contracts in determining the 4Q06 Reserve. In fact, defendants ignored two of the Company's biggest unprofitable WSAs that contained the same money-losing contract terms which necessitated the 4Q06 Reserve. Specifically, the Baldy Mesa project and Basin's largest contract, involving Coachella, were not included in the

4Q06 Reserve. The announcement of the 3Q07 Reserve only partially disclosed Basin's true financial condition, which was disclosed on August 11, 2008.

<u>SUBSTANTIVE ALLEGATIONS</u>

Basin's Water Processes and Business

49.     Basin designs, builds, implements and services systems for the treatment of contaminated groundwater. The Company has developed an ion exchange treatment system that reduces groundwater contaminant levels. Basin markets its system to utilities, cities, municipalities, districts, real estate developers and other organizations that supply water for use in treating groundwater sources.

50.     Basin's decontamination solution functions by passing water through a "tank full of resin." The contaminants bond with the resin in an ion exchange that rids the water of particular contaminants. A key calculation is "the bed volume calculation" – which is the total decontaminating capacity of the resin bed, which is a function of the contamination level in the particular water supply. For instance, it might be that a resin bed could process 600 bed volumes given the level of contamination in a particular water source before the resin bed's decontamination capability was exhausted and the resin needed to be replenished. As such, determining the bed volumes for each water source were "critical" calculations to determine the operating costs Basin would incur, including not only how much salt a particular contract would require, but also how many times

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

maintenance crews would need to come to the site to haul away the waste to a certified waste disposal site.

51.     In preparing to bid on a particular opportunity, Basin could figure out how to build its basic equipment costs into a long-term lease arrangement of 10, 15 or 20 years so that those equipment costs would be recouped in the lease payments at some point prior to the expiration of the lease-term (7 to 8 years from the inception of a 10 or 15 year lease).

52.     Every system at each well-site had electronic sensors that measured a variety of operational metrics, including the volume of water being processed. The volume of water being processed, as well as other monitoring devices on the systems, would – among other data – provide specific information regarding the amount of chemicals being utilized and consumed on the system, as well as the tank level of the brine.

Basin's Business Strategy

53.     Basin basically had two main types of contracts – straight-forward equipment sales and lease arrangements, which were referred to as "BOOM" deals (for Build-Own-Operate-Maintain) in which Basin retained ownership of equipment and charged clients a processing fee per acre-foot of water treated. Basin also billed its customers for treating water on a per acre-foot of water basis. Elements of the contracts varied. Certain contracts were "take or pay" which meant

- 27 -

Basin billed a client for a fixed amount of acre-feet every year even if the client did not actually end up having that much water processed. Other contract elements included a maintenance contract that usually involved "an annual fee" payable by the client for all maintenance that a given plant required. Tekulve had done some kind of analysis as to the types of contracts that needed to be closed and the cash flow that Basin needed to derive.

54.     Jensen and Tekulve had been cautioned on more than one occasion that Basin should wait a minimum of 6-months, but as much as 12-months before going public. Before going public Basin needed to demonstrate three quarters in a row of profitable operation, as well as "a reliable pipeline" in which potential business that Basin projected "regularly turned into sales."

55.     Showing consistent profitability and converting prospective opportunities into actual contracts was critical to Basin because of the very lengthy timelines necessary to close water deals. The shortest life-cycle of a one million dollar contract for Basin – whether for a BOOM deal or equipment sale – was 18-months and closer to 24-months. This was a reflection that a municipality needed to allocate funds for decontamination work, develop its needs and associated plans and specifications. All of these steps took significant time to achieve. The sales cycles were very long, even up to 30 months.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

56.     The solutions offered by Basin's competitors were invariably cheaper than the Basin solution. Basin was invariably among the most expensive amongt the bids submitted by it and its competitors. Basin had "bought" the Coachella and Baldy Mesa contracts, among others, by Basin bidding too low and ended up with the problems that ultimately led to the charges for WSA legacy contracts in 4Q06 and 3Q07.

57.     Defendants entered into loss-leader contracts which were unprofitable as they were bid too low by design simply to increase the Company's anticipated revenues even though they would not help the Company's bottom line. These contracts, which included Coachella and Baldy Mesa, allowed the Company to report increased anticipated revenues in advance of Basin's IPO.

58.     VP of Business Development Rowe and Chuck Bryant, an independent contractor paid by commission, each of whom reported directly to Jensen, played critical roles in developing and facilitating transactions that constituted Basin's many problematic and money-losing contracts. Jensen and Rowe worked very closely together in developing deals and Jensen and Rowe worked very closely on two of Basin's problematic WSA legacy contracts – Coachella and Baldy Mesa. .

59.     Coachella represented one of Basin's largest deals – if not the largest deal of all – and was worth approximately $7 million for the Company.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

However, Basin was losing money on the Coachella project. Tekulve made comments such as, "Oh, we're upside down on that [Coachella]."[10]

60.     The Coachella contract was by far the biggest contributor to the write-down that was taken in November 2007: $600,000. Additionally, not one Arizona contract was operating profitably – some of which contributed $200,000 - $250,000 per well to the write-down. 80% of the losses that contributed to the write-down could be attributed to 20% of the wells.

Basin's WSA Legacy Contracts

61.     Jensen and Tekulve were both absolutely knowledgeable that the contracts were going to lose money for the durations of their terms because Basin's contracts with water municipalities had essentially unchangeable terms. While escalation fees might be built into the contracts that could require the municipality to pay extra money to cover certain increasing costs, that wasn't going to help Basin with these contracts.

62.     Some contracts could not be renegotiated and some did not have terms allowing Basin to pass on higher costs. Specifically, it was only in late 2006

---

[10] Furthermore, Pat Kelly held meetings every Monday with all of the Company's Field Managers to discuss the status of different projects. Kelly maintained "an ongoing log" of all of these discussions regarding the "day-to-day" operations of the systems. Jensen sat in on some of these meetings as well, which were held in the main conference room (there was only one) at Basin's Rancho Cucamonga headquarters and which was located next to Tekulve's office. Besides Kelly and Jensen (on occasion), other attendees included Engineering Director Bill Schwartz, Production Manager Chris Moore, who oversaw manufacturing, and various field service technicians, some of whom phoned in and participated in the meetings by conference call.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

that Basin began ensuring that contracts going forward had such terms in them, but this was not the case for Basin's WSA legacy contracts.

Jensen's and Tekulve's Influence and Control Over Basin's Water Deals and the Guter Calculations

63.     A preliminary part of preparing a bid for a municipal contract included first obtaining a sample of the water that would ultimately be processed by whatever entity ended up winning the project bid. Once such samples were obtained, they were forwarded directly to Jensen. Jensen then personally analyzed the samples and performed so-called "Guter Calculations." The "Guter Calculations" were so-named because they had been developed by Basin's late Chief Scientific Officer, Dr. Gerald Guter. According to Basin's 2006 Form 10-K, "[Basin's] proprietary process was conceived" by Jensen and Guter. Once Jensen provided the numbers, Tekulve and any other salesperson involved in the deal, together determined the price of the bid.

64.     While Jensen's calculations were an important element for determining Basin's waste/arsenic disposal costs, Jensen's calculations were more in the order of determining the total salt costs of a project. All of Basin's processing costs, including arsenic/waste disposal are rolled into an acre-foot charge.

65.     A spreadsheet that set forth the acre-foot cost and the margin that Basin wanted to achieve based on those costs would become basis for Basin's bid proposal.

66.     Operating data was necessary in order to effectively use the Guter Calculations. Updates to the Guter Calculations which were exclusively controlled by Jensen are necessary because water quality can vary over time and the calculations may need to be reevaluated. Significantly, because the Guter Calculations had to be updated, and Jensen had exclusive control over the calculations, Jensen was aware of which systems were operational and which systems were not.

Underperforming/Problematic WSA Legacy Contracts

67.     There were only a few old WSA legacy contracts that would have gone online in 2007, specifically: Baldy Mesa, a couple of systems involving Arizona Water Company ("Arizona Water"), a project with Avondale, Arizona, the Town of Gilbert, Arizona ("Gilbert"), and Basin's major project involving Coachella. The Gilbert contract was scheduled to go on line in April/May 2007, and was an arsenic treatment contract. The Arizona Water contract was a multi-system deal that involved a number of systems that went online at different times and in different locations. For instance, systems in Rimrock and Sedona had gone online in 2005, and others went online in early 2006 and in summer 2006. Nonetheless,

there were delays on the overall contract and there were still at least a couple systems still pending to go online in 2007.

68.     During a meeting of the Company's sales personnel in November 2006, Stark announced that "all of our accounts" had pricing and profitability problems. As of November 2006, Basin most definitely had a lot of work to do with existing contracts that were already online and with contracts such as Baldy Mesa, Gilbert, Arizona Water, and Coachella, where the systems were scheduled to go online in 2007.

69.     Treating arsenic and particularly the "brine waste" that was created was very challenging. This was because Basin's technology involved passing contaminated water over resin beds, which strip out the contaminants by way of an ion exchange. However, the resin beds reach a saturation point and need to be replenished which is accomplished by rinsing the beds in a salt-laden brine solution. The brine then becomes laden with arsenic and disposing of the arsenic is challenging, difficult and expensive.

70.     Basin had put into place, or sold the contracts, for a number of arsenic decontamination projects, but that none of these systems had been implemented. For instance, Basin had sold projects with Arizona Water for arsenic decontamination at a number of different well-sites, but had yet to install any of them.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

71.    When Basin's arsenic decontamination contracts had been signed, even though the implementation had yet to be undertaken and/or completed, this meant the pricing that Basin would ultimately charge its customers had already been negotiated and fixed in the contracts.

72.    Once Coachella granted its final acceptance to Basin on September 13, 2007, Basin started charging Coachella processing fees on the volume (in acre-feet) of water that the systems processed.

The $4.7 Million Write-Down of Unprofitable Contracts

73.    At the time the $4.7 million charge was disclosed in November 2007, not all of Basin's contracts had come online and were therefore not operational. For this reason, Basin was not able to estimate the likely losses these pending contracts would derive. These pending contracts had been entered into at the same time as other money-losing contracts and it was highly likely that Basin would suffer losses once these pending contracts actually began operating.

74.    Stark came back unexpectedly from a vacation at some point in September 2007 and made it an urgent priority that all of Basin's operating projects be reviewed and that the review be completed in three days.

75.    The data which was used to determine the relative profitability (or lack thereof) for all of the operating wells was set forth in excel spreadsheets. Basin

did not have a system in place by which to determine the profitability of the wells during this September 2007 timeframe.

76.     While Stark initiated the review project, it was actually handled by Tekulve, who oversaw the efforts of the 20 or so personnel who had been assigned to it. Basin had contracts that had not yet gone online as of the time of the write-down in 2007 but that these contracts would be money-losers too when they actually became operational.

77.     Virtually every contract that was reviewed in this September 2007 process were "losers" and the majority were egregiously unprofitable, with minor exceptions where a couple of wells were realizing trivial profits.   A couple of projects were projected to become profitable – but the anticipated margins were, again, trivial – 1% - 2% at most.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

November 14, 2006 – March 28, 2007

78.     On November 14, 2006, Basin issued a press release entitled "Basin Water, Inc. Reports Third Quarter 2006 Results; Quarterly Revenues at $4.8 Million, Nine-Month Revenues Increase 75% from 2005 to $13.5 Million":

> Basin Water, Inc. today reported financial results for the quarter and nine months ended September 30, 2006.
>
> For the third quarter of 2006, revenues of $4.8 million were a slight improvement over the third quarter of 2005. Meanwhile, 2006 nine-month revenues increased by 75% to $13.5 million compared to $7.7 million for the first nine months of 2005. System sales revenues for the third quarter 2006 were $3.9 million compared to $4.2 million in the same period in 2005. The nine-month 2006 system sales revenue grew

81% over the same period of 2005. Operating contract revenues continue to increase compared to the prior year as a result of growth in placement of our groundwater treatment systems.

79.     The November 14, 2006 press releases was followed by a November 14, 2006 investor conference call (the "3Q06 Conference Call") for analysts, investors and media representatives hosted by Jensen, Tekulve and Stark, wherein defendants repeated their assurances regarding the strength of the long-term service contracts.

[JENSEN:] On the contract revenue side, we're seeing the beginning of new systems coming online over the next several quarters and expect good growth in this area. During the third quarter, we've incurred higher volume-related contract operating costs, mostly energy cost for waste disposal as well as the increased engineering and fueled service labor expense. We have cost protection clauses in most of our contracts and we expect to reduce the impact to the entire costs over the next several quarters.

[TEKULVE:] Our backlog, which represents the revenues we expect to recognize over future periods based on the agreements we currently have as we end September continues to grow. Backlog today amounts to $81 million compared to approximately $55 million a year ago.

[TEKULVE:] Actually, under our agreement with Shaw, they need to maintain – they need to sell $2 million a year in each state to retain exclusivity. They have purchased $5 million worth of equipment from Basin to date. The reason that there's no Shaw sales in this quarter again, is that that's the way they're operating today on the purchases. They purchased eight units from us already. They're very active. We have a full-time person assigned to them. They're very active in a number of areas and we think they're making very positive progress. We cant control which quarter they opt to buy units from us at.

                              *       *       *

[ANALYST:] Okay. And now going to the backlog, you said I think $85 million is your backlog right now. Is this just the recurring contract or lease revenues, or does this also include some of the existing sales orders that you have?

[TEKULVE:] No, this represents the long-term service contract revenue that we expect to receive over the next life of those contracts.

                              *       *       *

[STARK:] I will hazard kind of a general statement, and that is that we

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

– not different than what we discussed on the road show, we are looking for significant growth. And in the past, we've gone from a $4 million – excuse me, a $2 million a year to a $4 million a year to a $12 million a year and you've quoted some numbers for our performance this year, but we do expect dramatic growth over the next several years, dramatic is always a relative term.

\*        \*        \*

[ANALYST:] And then also wanted to try to quantify the impact from the higher disposal costs as well as some of the other component costs that also flared up in the quarter and try to understand maybe the impact that those had on margins as well?

\*        \*        \*

[TEKULVE:] So what I've indicated and this was discussed actually on the prior phone call a quarter ago, we are going through a process of effectively renegotiating these older contracts to provide recovery to us certainly on a go-forward basis. I don't think on a going-back basis we'd be too successful, but our intent is to get that cleaned up in the next quarter or two. So I think that's the question you're answering. As these new contracts, we've talked about these new systems that we've deployed that are in the final stages of permitting come online, those do have the cost protections, those do have current pricing and you're going to start see this turning a corner for us.

80.     Again, the market absorbed Basin's false statements as evidenced by a December 4, 2006 analyst report by Timothy M. Winter, CFA of Edwards entitled "Basin Water, Inc. Industrial Machinery – Equity Research Recent Development Report," which repeated information received from Basin management regarding Shaw Group:

\*        \*        \*

The agreement called for Shaw to purchase $5 million of [Basin's] systems by the end of 2006, which has been satisfied, and under the terms of the contract, Shaw must sell $2 million of equipment per year per state in order to maintain exclusivity in that state.

81.     Following the positive news that Basin had recognized revenue from Shaw and that Basin's WSA legacy issues would be resolved, Jensen sold 50,000 shares on December 12, 2006 for proceeds of $320,5000. Then a little more

than one month prior to Basin announcing the 4Q06 Reserve and the Company's well-by-well review, Jensen on February 20, 2007 sold 57,281 shares for proceeds of $458,248 and on February 21, 2007 sold 42,719 shares for proceeds of $341,752. Jensen's February 2007 trades prior to Basin's announcement of the 4Q07 Reserve netted him $800,000.

82.     The foregoing statements made by defendants between November 14, 2006 and March 28, 2007, were false and misleading because: (a) Basin's legacy contract issues could not be "cleaned up in the next quarter or two" because defendants knew that they were waiting for operational data from major WSA legacy contracts, several of which defendants knew were not set to become operational until the end of summer 2007; (b) Basin had not recognized $5 million from Shaw at the end of 3Q07; and (c) Basin was misrepresenting to investors the future prospects of the Shaw contract.

March 29, 2007 – May 13, 2007

83.     On March 29, 2007, Basin issued a press release and conducted an investor conference call (the "4Q06 Conference Call") for analysts, investors and media representatives hosted by Jensen, Tekulve and Stark, during which defendants falsely claimed that they had completed an analysis of each of their contracts and reassured investors that "were accounting for [WSAs] all correctly":

> [JENSEN:] To summarize, for several months, some of our older contracts have generated losses due to increasing weight disposal and other operating costs with no cost protection or pass through clauses in

these contracts.

Due to improvements in management controls and other – and our accounting systems during the latter part of the year and based on a thorough analysis of each of our contracts that was completed – that was recently completed in early 2007, we concluded certain of these systems will likely continue to generate operating losses for the remaining contract terms. Accordingly, we recorded a $3.7 million charge to cost of revenues in the fourth quarter of 2006.

*       *       *

We have cost protection clauses on all but our old lease contracts and we'll be diligent in having our clients carry their fair share of these higher costs over the next several quarters.

*       *       *

[STARK:] I joined the company just five months ago at the end of October 2006, with my mission being that of positioning Basin for predictable growth and enhancing shareholder value. I found the company lacking in formal business systems, very typical for an entrepreneurial company in the early stages of growth. For example, there was not flow diagram or developed procedures to picking the process from prospect identification to the start up and ongoing operation of an installed system.

The sales force had no forecasting model. There was no methodology for passing information from the selling activity to process engineering and then on to design engineering. We lack QAQC in the manufacturing process and a formal program for passing the baton from construction management to field service. In addition, there was no account management system that designated responsibility for operational and financial performance on each of the water services contracts.

*       *       *

During the last quarter, we identified the contractual deficiencies and operating system flaws, we revamped the sales force, reorganized field services, began to install appropriate QAQC procedures, installed pricing policies, created an account management system, developed a forecasting model and created a proposal approval procedure.

While installing these needed systems and after assigning an account manager to each existing system, we also performed an indepth review of each of our operating contracts and as you know we took the required financial reserves for future contract losses.

In spite of the lack of many important formal business systems and procedures, Basin Water managed to grow revenue by 40% to 17 million in 2006. We expect to continue that approximate level of growth for 2007 and beyond.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

1                                    *        *        *

2     [STARK:] [O]ne of the things that we did early on in the fourth
      quarter is we began a review of all of our water service agreements.
3     And we established a profit and loss statement for each, what we call,
      WSA, Water Service Agreement. So we established a WSA, a P&L for
4     each WSA and a going forward pro forma.

5     And then we assign sales people to each of our accounts and again our
      account management system. So what we identified were the loss
6     contracts, the ones that were under water and we went back to
      determine how we could fix those contracts within the scope of the
7     existing contract and what had to be done to change that scope in order
      to recover what additional recovery could be made.
8
      And we have set a plan forward for improving those contracts. The
9     reserve we've taken is to eliminate the loss and basically take those
      contracts to zero in the future, although we are hopeful of improving
10    that performance.

11    But in general, we have taken the reserves to take the negative WSAs
      to zero and we believe that our future WSAs will be positive, good
12    positive gross margin. And so we should begin to see an increase in
      that gross margin over the year. No doubt about it.

13                                   *        *        *
14
      [STARK:] Well it's just that we just created the P&Ls for all of those
15    WSAs and we believe we've got everything in the right bucket and we
      believe that we're accounting for it all correctly.
16
      But I'm just being a little bit cautious by telling you that there may be
17    one or two more that we overlooked. I'm – we certainly don't have an
      ongoing problem with pricing or costing and pricing.
18
19         84.      On March 29, 2007, Basin reported its year end 2006 results on

20    Form 10-K and these results were repeated by the market in a Business Wire

21    entitled "Basin Water, Inc. Reports Year End 2006 Results; Twelve-Month

22    Revenues Increase 40% from 2005 to $17.1 Million, Takes Reserves." The press

23    release stated in pertinent part:

24
25         For the year ended 2006, revenues increased by 40% to $17.1 million
           compared to $12.2 million for the year 2005. For the year, system sales
26         revenues were $13.9 million, compared to $10.0 million in the same
           twelve-month period in 2005. Operating contract revenues of $3.3
           million increased by 47% on a year over year basis.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

\*       \*       \*

Due to improvements in management controls and in the company's accounting systems during the latter part of the year, and based on an in depth review of the company's contracts over the past few months, we determined that certain of these systems will likely continue to generate operating losses for their remaining contract terms. Accordingly, in the fourth quarter, we recorded this reserve.

\*       \*       \*

Mike Stark, President and Chief Operating Officer commented: "I joined the company to help Basin Water in its transformation into a profitable, predictable growth organization with a national presence.

What I initially found here was a lack of internal business systems, quite typical for an entrepreneurial company in the early stages of growth. Over the past five months, we identified our contractual deficiencies, revamped our sales force, reorganized field services, brought in additional talent and boosted our management team, performed an in depth review of each of our operating contracts and took the required financial reserves for future contract losses. We are taking all the tough steps. But by the end of the second quarter in 2007, we believe we will complete the needed corrective actions and internal changes to the organization. During 2007, you will see us expand our service offering and our geographic presence. We also expect to be profitable by no later than the fourth quarter of 2007. By 2008, we should begin to achieve leverage from operations and be experiencing self-funded profitable growth."

85.    On April 2, 2007, Basin filed its Form 10-K with the SEC which was certified by Jensen and Tekulve.

During the latter half of 2006 and early 2007, improvements to [the Company's] management controls and accounting systems enabled [the Company] to more thoroughly analyze operating results for each service contract and determine that certain, generally older contracts were operating at net cash flow losses. . . . [The Company] recorded a reserve for future contract losses in the amount of $3.7 million in the fourth quarter of 2006. This amount represents the losses which [management] expects to incur during the remaining term of these contracts.

86.    On May 9, 2007, Basin issued a press release entitled "Basin Water Executes Definitive Agreement to Purchase Water Conveyance and Water Resources in Southern California," which announced that on the same day Basin Water Resources, Inc., wholly owned subsidiary of Basin, and sellers Indian Hills

- 41 -

Water Conservation Corporation, West Riverside Canal Company, West Riverside 350 Inch Company, Henry Cox and John L. West entered into a Stock and Asset Purchase Agreement (the " Stock and Asset Purchase Agreement"). Pursuant to the terms of the Stock and Asset Purchase Agreement, BWRI had the right to purchase from sellers (a) a canal located in San Bernardino and Riverside counties that is approximately eighteen miles in length, (b) rights to pump water from the San Bernardino Basin, and (c) other equipment and tangible and intangible personal property of the Seller (collectively, the "Assets") for total consideration of $1,500,000 and a percentage of net income generated from future operations of the Assets.

87.     The foregoing statements made by defendants between March 29, 2007 and May 13, 2007, were false and misleading because: (a) Basin's WSA legacy contract issues had not been taken care of with the 4Q06 Reserve because defendants knew that the 4Q06 Reserve did not account for all then-known problematic WSA legacy contracts; (b) Defendants failed to disclose that they were waiting for operational data from major WSA legacy contracts, several of which defendants knew were not set to become operational until the end of summer 2007; (c) Defendants knew at the time they announced the reversal of a portion of the 4Q06 Reserve that the 4Q06 Reserve did not account for all then-known problematic WSA legacy contracts; (d) Basin did not take the "required financial

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

reserves" for all known future contract losses on its WSA legacy contracts; (e) Basin had not established a P&L for each WSA and nor was Basin's "accounting for it all correctly" to "eliminate the loss" and "take the contracts to zero;" (f) Basin had not completed a "thorough analysis of each of our contracts" and "an in-depth review of our operating contracts," and could not address each of its WSA legacy contract issues because it did not have operational data from major WSA legacy contracts; (g) Basin had not incurred the necessary expenses to fix legacy issues and could not have "identified contractual deficiencies and operating system flaws" because it did not have operational data from major WSA legacy contracts, including those not yet operational; (h) Defendants did not have a basis to maintain that Basin would "be profitable no later than the fourth quarter of 2007;" and (i) Basin had prematurely recognized revenue in connection with a sales agreement with Shaw.

May 14, 2007 – August 13, 2007

88.     On May 14, 2007, Basin issued a press release entitled "Basin Water, Inc. Reports First Quarter 2007 Results; Quarterly Revenues at $1.6 Million, Net Loss of $2.2 Million; Announces Stock Repurchase Program." The press release stated in pertinent part:

> The Company has made tremendous progress on transitioning from a start-up company to a strong revenue growth company with predictable profitability.

\* \* \*

- 43 -

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

The dilemma we faced at this juncture was the option of continuing to operate as the startup entity we were – focused on sales and not focusing on the profitability of each project and not developing the organization for a national reach – or choosing to revamp the sales force, design and implement our business systems and disciplines and prepare and restart in a manageable and predictable way. We have chosen the latter course, and expect the transition efforts to be completed in the second quarter . . . and we expect to be profitable in the third and fourth quarter.

*      *      *

Stock Repurchase Program

Our Chief Executive Officer, Peter Jensen, stated, "We believe that with our technology, our quality clients and our business model, Basin Water has an extremely bright future. As a demonstration of that confidence, and as a result of our strong balance sheet, our Board of Directors has authorized us to implement a stock repurchase program. We have been authorized to purchase up to $10.0 million of our stock from time to time in the open market. We plan to make these repurchases using our working capital and will be made in compliance with all applicable legal requirements.

Our transition efforts are showing marked successes, our organization is demonstrating its ability to focus on disciplined, aggressive and creative methods for growing the company. We have all the tools in place now, and believe the second half of 2007 will demonstrate to our stockholders that the organization can leverage those tools and build this company into a profitable company with predictable revenue growth, taking advantage of a huge market.

89.    The May 14, 2007 press release was followed by an investor conference call (the "1Q07 Conference Call") for analysts, investors and media representatives hosted by the Tekulve, Stark and Jensen, wherein they repeated assurances that the WSA legacy contract issue was behind them and fully reserved for.

[STARK:] You may recall that in the prior year, we established a reserve for certain increased cost being experienced on older contracts.

With the reversal of a portion of this reserve this year, we expect the margins on our contract revenue to begin reflecting more customary margins during 2007.

*      *      *

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

As we promised you, we tended to the restructuring of the company and made significant progress. Mike previously said that Basin Water would slip into profitability in the third and fourth quarters of 2007.

I also predicted that the company would be cash positive for its core operations in 2007, and I remain committed to that view.

\*       \*       \*

[JENSEN:] [W]e have executed a definitive agreement to purchase control of the West Riverside Canal Company, a 350 Inch Water Company here in southern California. We intend to use this acquisition as a platform for a regional water resource business. By expanding the utilization of both these assets and using Basin Water's expertise in drinking water treatment, the company has a potential to convert a significant, non-potable water resource into drinking water supplies.[11]

[ANALYST:] In terms of cost pressures, can you comment on salts or offtake on the brine or on the resin side, any particular cost pressures that you're seeing as you map out your rest of the year here in '07?

[STARK:] Yes. Actually, we have been engaged in a process of improving our cost basis in those areas. . . . And we expect, actually, to see a [sic] overall decrease in our cost of residual management and salt purchases.

90.       On May 14, 2007, Basin also filed its 1Q07 report on Form 10-Q with the SEC, in which defendants assured investors that the Company's financial statements were stated in accordance with GAAP, regardless of Basin's lack of internal controls.

At its May 10, 2007 meeting, the Company's Board of Directors approved a plan to repurchase up to $10,000 of the Company's common stock from time to time in the open market. The Company intends to make these repurchases using its working capital.

\*       \*       \*

Operating costs for our contract revenues increased $0.1 million, or

---

[11] On January 4, 2008, another company, Empire Water, Inc. ("Empire Water") filed a Form 8-K with the SEC and attached as an exhibit the original West Riverside Canal Company ("Canal") acquisition agreement that Basin had announced in May of 2007. The Canal acquisition rights, that Jensen had touted for seven months, were transferred to a shell company on December 28, 2007, that had, just a few days prior, changed its name from "Cascade Coaching Corp." to "Empire Water." Less than two months later, on February 19, 2008, Jensen resigned from his position at Basin and the same day immediately took over as Principal Executive Officer of Empire Water without a salary, while still receiving a $200,000 a year consulting fee as part of his severance from Basin.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

17%, to $0.7 million during the first quarter of 2007 from $0.6 million in the comparable period of 2006. Operating costs include salt, waste disposal and field service labor expense, as well as depreciation expense and the increase in cost is reflective of additional systems in service in 2007 when compared to 2006.

We expect that our cost of revenues will increase in absolute dollars in future periods due to both an increase in the number of systems sold and higher costs of salt, waste disposal and increased field service labor expense, as well as higher depreciation expense, as a result of having more systems placed in service in future periods.

*        *        *

In light of these material weaknesses, we performed additional analyses and procedures in order to conclude that our consolidated financial statements for the year ended December 31, 2006, as well as our condensed consolidated financial statements included in this Quarterly Report on Form 10-Q for the three month period ended March 31, 2007, were fairly stated in accordance with US GAAP for such financial statements. Accordingly, management believes that despite our material weaknesses, our condensed consolidated financial statements for the year ended December 31, 2006 as well as our condensed consolidated financial statements included in this Quarterly Report on Form 10-Q, are fairly stated, in all material respects, in accordance with US GAAP.

91.      Following the 1Q07 Conference Call, on May 21, 2007, analyst Timothy M. Winter, of Edwards issued a report on Basin entitled "Recommend Investors Stay the Course." This report was based on and repeated information from the Individual Defendants: "As part of the internal focus on improving operations, management reviewed and projected profits and losses for each water service agreement and wrote-off the projected losses."

92.      On June 26, 2007, and based on defendants' false statements that the 4Q06 Reserve had eliminated all revenue problems from problematic WSA legacy contracts and that the Company would be profitable in 2007, analyst William Gibson ("Gibson") of Nollenberger, initiated coverage of Basin with

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

"Buy" rating in a report entitled "Clean Water From Contaminated Wells; Initiating Coverage at Buy. Gibson repeated information provided by defendants that: "Basin Water identified contractual deficiencies in operating system flows, . . . The [C]ompany completed a review of all its contracts in the 1Q07."

93.     On June 26, 2007, an Associated Press Financial Wire press release entitled "Basin Water Climbs as analyst Starts Coverage at 'Buy,'" noted that on the positive news reported by Gibson of Nollenberger, Basin's stock jumped 4.4%.

94.     Following the news entering the market that Basin had completed a review of all its contracts in 1Q07, including its problematic WSA legacy contracts, Jensen sold 15,400 shares on July 2, 2007, 14,951 shares on July 3, 2007 and 69,649 shares on July 5, 2007. Jensen's insider trading proceeds for these 3 days netted him $902,239. Then, on July 16, 2007, Jensen sold 32,110 shares, 7,890 shares on July 17, 2007, and 40,000 shares on July 19, 2007 for proceeds of $908,800.

95.     On August 13, 2007, analyst Gibson issued a report entitled "2Q07 Preview; Growth Rate Set to Accelerate," based upon information provided from defendants: "now that the operating infrastructure is fixed and revamped sales force is turned loose, we expect the pace of announcements for new systems to pick up in coming months."

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

96.        The foregoing statements made by defendants between May 14, 2007 and August 13, 2007, were false and misleading because: (a) Basin's WSA legacy contract issues had not been taken care of with the 4Q06 Reserve because defendants knew that the 4Q06 Reserve did not account for all then-known problematic WSA legacy contracts; (b) Defendants knew at the time they announced the reversal of a portion of the 4Q06 Reserve that the 4Q06 Reserve did not account for all then-known problematic WSA legacy contracts; (c) Defendants failed to disclose that they were waiting for operational data from major WSA legacy contracts, several of which defendants knew were not set to become operational until the end of summer 2007; (d) Basin did not have "all the tools in place" to address its legacy contract issues because it did not have operational data from major WSA legacy contracts; (e) Defendants did not have a basis to maintain that Basin would "slip into profitability in the third and fourth quarters of 2007" when they knew they did not have the necessary operational data from its WSA legacy contracts; and (f) Basin had not completed its internal operational transition of its business practices and processes and had not resolved the bulk of the issues concerning its WSA legacy contracts.

August 14, 2007 – November 13, 2007

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

97.      On August 14, 2007, Basin issued a press release entitled "Basin Water, Inc. Reports Second Quarter 2007 Results; Quarterly Revenues at $6.4 Million, Net Loss of $1.8 Million." The press release stated in part,

> For the second quarter of 2007, revenues of $6.4 million increased $1.4 million when compared to revenues of $5.0 million in the second quarter of 2006, a 28% increase. System sales revenues were $5.2 million for the second quarter of 2007, compared to $4.2 million in the same period in 2006. As anticipated, the increase in system sales revenue this quarter was due primarily to a third party financing arrangement whereby Basin Water sold 10 water treatment systems of various capacities which had previously been placed with customers.

> *      *      *

> Transition Completed

> The President and Chief Operating Officer of Basin Water, Mike Stark, commented, "Over the past three quarters, we have been very focused on our transition efforts on establishing internal business processes and building the organization to effectively prepare for our intended growth and profitability. The Company has, for the most part, completed the transition efforts and we are now organized to pursue profitable revenue growth beginning in the second half of this year.

> We have, in a very short period of time, transitioned from a start-up company to a company capable of strong revenue growth with predictable profitability."

> *      *      *

> Mr. Stark added, . . . "We have completed our transition efforts; our organization is now poised to demonstrate its ability to focus on disciplined, aggressive and creative methods for growing the company. We have all the tools in place now, and believe the second half of 2007 will demonstrate to our stockholders that the organization can leverage those tools and build this organization into a profitable company with predictable revenue growth, taking advantage of the immense market in which we reside."

98.      The August 14, 2007 press release was followed by an August 14, 2007 investor conference call (the "2Q07 Conference Call") for analysts, investors and media representatives hosted by the Tekulve, Stark and Jensen, wherein they

- 49 -

repeated assurances that the WSA legacy contract issue was behind them and fully

reserved for.

> [STARK:] We initiated all these needed business processes and incurred the necessary expenses to fix legacy issue. . .

<center>*       *       *</center>

> On the positive side, we feel we have finally reached the end of the legacy issues. . . .

<center>*       *       *</center>

> I am sure those of you who have been following Basin's transition will recall that in the prior year we established a reserve for certain unbudgeted costs being incurred on older contracts. With the reversal of a portion of this reserve this year, we expect the margins of our contract revenue to begin reflecting more customary levels during the fourth quarter of 2007 and, again, on into 2008.

<center>*       *       *</center>

> I have also said that Basin Water as a whole would slip into or approach profitability in the third quarter and be profitable in the fourth quarter.

> I still expect this will occur and that the Company will be cash positive from its core operations in 2007. . . .

<center>*       *       *</center>

> We're pretty enthusiastic about the third and fourth quarter as they represent a visible turnaround in Basin Water's performance . . . we're counting heavily on the fact that we have gotten our arms around the legacy issues, which we believe we have . . . .

<center>*       *       *</center>

> [ANALYST:] You mentioned in your press release that you sold 10 systems that were previously placed with customers, as far as the whole financing thing goes, the third party financing goes. Were there new system sales, as well?

> [TEKULVE:] Actually there is a total of 10 systems that were sold. Actually, three of those systems were – they were varying sizes – but three of those systems were recent systems that we had delivered, and we were originally planning to turn from a lease into a sale. And then as we got into the transaction, the initial folks we were working with needed a bigger transaction so we threw some more in there to get a larger dollar level for the first transaction.

> [STARK:] You know, maybe we ought to try – spend a second to try

<center>- 50 -</center>

to clarify the whole purpose of that transaction. As you all will recall in the fourth quarter of 2007, and again in the first quarter of – I mean of 2006, and again in the first quarter of 2007, we talked about having made the decision to finance projects that our clients didn't particularly want to own through third-party financing. And we also talked about the fact that we had a number of legacy contracts which didn't have the most favorable contract terms and they were going to create some difficulty in getting that financing done.

Nevertheless, we made the decision to go out and do that so that as our business grew, we would have the mechanism in place to be [able] to do routine project financing, and by doing that routine project financing we would keep our cash consumption to a minimum as the Company grew in terms of project costs and we would be able to put that cash into growth opportunities.

So this first batch of financing was not easy to do, but it was necessary to do now while we have a significant balance sheet, plenty of cash in the bank, and really not in any great straights about raising the money, but getting the system in place that allows us to do it in the future on a routine basis was considered by this management team to be a very important step.

So we took that step. Hence, [Tekulve] says that the first cadre of systems that we threw out there were not really very exciting to the investment community. They were small and we had to talk to folks about the fact that there was a big opportunity – we could increase the bucket.

That was the next staunch of opportunities would have better contract terms and be more reasonable. . . .

*     *     *

[STARK:] Not meaning to be sneaky or give you weasel words. What we said exactly was that we would slip into profitability during the third quarter and that we would be profitable in the fourth quarter. So what we were saying is that the worm would turn in the third quarter, and we may or may not be profitable for that whole quarter, but we definitely would be profitable in the fourth quarter. And we're still saying the same thing, Jesse.

[ANALYST:] Okay, I wanted to clarify it to make sure I had it right. As far as gross margins go, we're talking about, somebody mentioned you were looking to get to customary levels for the contract side by 4Q '07. How about on the other side of the business? The system sales?

[STARK:] We're also expecting to hit anticipated margins in the capital side of the business. We didn't say the contract side, we would come all the way up to expected margins because what we said is we took a reserve that zeroed out the losses, and so as we add new contracts at the appropriate margins, we expected to see that overall margin continue to improve.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

1                                    *        *        *

2   [ANALYST:] [T]here was a new line item on the balance sheet, a
    long-term note receivable? What does that represent?

3

4   [TEKULVE:] Under the third party financing arrangements, we have
    72 months of payments, that's a long-term note receivable that is new
    with this transaction.

5

6   [ANALYST:] Okay. And then the previous gentlemen mentioned the
    revenue recognition would not hit against CapEx, but it appears that
    that was hit against CapEx in that quarter. Am I correct?

7

8   [TEKULVE:] I'm not clear on with what you're asking?

9   [ANALYST:] In the cash flow statement, under, I'm just trying to get
    to how you were recognizing this revenue because it is accounted for
    as an investment activity this quarter?

10                                   *        *        *

11

12  [TEKULVE:] What we have done is we've taken 10 systems that most
    of those costs were recorded down in the property, plant and
    equipment line on the balance sheet. Those costs were incurred in the
    prior year. Most of them. What we have done is we've sold 10 of these
    different systems and that became the cost of our goods, okay. Our
    cost of goods sold and that hit our P&L. Okay?

13

14

15  [ANALYST:] Okay.

16  [TEKULVE:] On the cash flow statement, what you would normally
    expect if you were selling a building, or other PP&E, you would
    normally expect to see a reduction in your PP&E in the investing
    section on the cash flow.

17

18

19  [ANALYST:] I get it.

    [TEKULVE:] Okay?

20

    [ANALYST:] Yes.

21

22  [TEKULVE:] Because this went through cost of goods and it's part of
    our sales, it's part of our operating cash flow.

23  [ANALYST:] Okay.

24  [TEKULVE:] Does that make sense?

25  [ANALYST:] Yes. Have you guys said who the third party is?

26  [TEKULVE:] It's actually a group of banks.

99.      On August 14, 2007, Basin filed its 2Q07 report on Form 10-Q for the quarter ended June 30, 2007, which was signed by Tekulve and certified by Jensen and Tekulve, the Form 10-Q stated in pertinent part:

> In June 2007, the Company sold 10 of its existing systems with various treatment capacities which had previously been placed with customers to a third party affiliate of a bank. As part of this transaction, the Company assigned all of its future standby fees from these 10 systems to the third party. Net proceeds to the Company consisted of $500 in cash, plus a non-interest bearing note receivable due in 72 monthly installments of $56 each, commencing April 2008.

> The aggregate present value of the notes is $3,353, which has been recorded by the Company as notes receivable as of June 30, 2007. The present value of the notes receivable, together with the cash paid by the third party, have been recorded as $3,853 of system sales revenues for the quarter ended June 30, 2007.

> *      *      *

> Operating costs for our contract revenues increased $0.2 million, or 18%, to $1.3 million during the second quarter of 2007 from $1.1 million in the comparable period of 2006. Operating costs include salt, waste disposal and field service labor expense, as well as depreciation expense and the increase in cost is reflective of additional systems in service in 2007 when compared to 2006. Contract revenue operating costs for the second quarter of 2007 were partially offset by the reversal of $0.3 million of reserves for contract operations losses which were previously recorded in the fourth quarter of 2006.

100.      Following the 2Q07 Conference Call, analyst John Quealy of Canaccord Adams Inc. ("Canaccord"), issued a report on August 15, 2007 entitled "Q2 Review: Basin Looking to Whet Investors' Appetite," which repeated information from defendants and stated that, "on the call, management was more confident, reiterating that Y/Y 2007 revenue growth of 25-35% is still expected, while stating that "80%" of H2/07 revenues have been finalized, supporting the guidance of a profitable Q4 and fully cash flow positive in C2007."

101.     Additionally, based on information provided by defendants, Jesse T. Herrick, an analyst with Merriman Curhan Ford, stated in his analyst report dated August 15, 2007 that, "Basin remains positive regarding its internal transition of business practices and believes the bulk of the issues with the legacy contracts have been resolved, but the [C]ompany believes it will not yet achieve sustained profitability until 4Q07, with the possibility of 'slipping into profitability' at some point during 3Q07."

102.     On August 20, 2007, the Company filed its Form S-3 with the SEC and stated the following: "As of December 31, 2006, we had 26 customers. Our top two customers collectively, accounted for 47% of our revenues during 2006 and typically have more than one contract with us for services provided to different wells."

103.     On September 17, 2007, Basin issued a press release entitled "Basin Water Completes Acquisition of Mobile Process Technology, Co.: New Technology and Personnel Are Expected to Create Synergies, Extend Geographical Reach in Municipal Drinking Water and Provide a Platform for Industrial Water and Wastewater Services and Related Treatment Activities." Basin acquired MPT for approximately $12.5 million, consisting of approximately $6.9 million in cash and 462,746 shares of the Company's stock worth approximately $5.3 million.

- 54 -

According to the press release, MPT was forecasted to have annual sales of approximately $6 million for 2007.

104.    The foregoing statements made by defendants between August 14, 2007 and November 13, 2007, were false and misleading because: (a) Basin's WSA legacy contract issues had not been taken care of with the 4Q06 Reserve because defendants knew that the 4Q06 Reserve did not account for all then-known problematic WSA legacy contracts; (b) Defendants knew at the time they reversed a portion of the 4Q06 Reserve that the 4Q06 Reserve did not account for all then-known problematic WSA legacy contracts; (c) Defendants failed to disclose that they were waiting for  operational data from major WSA legacy contracts, several of which defendants knew were not set to become operational until the end of summer 2007; (d) Basin had not "completed its transition efforts" and did not have "all the tools in place" to address its legacy contract issues because it did not have operational data from major WSA legacy contracts; (e) Basin had not incurred the necessary expenses to fix legacy issues and had not "gotten their arms around the legacy issues" because it did not have operational data from major WSA legacy contracts; (f) Defendants did not have a basis to maintain that Basin would slip into or approach profitability in the fourth quarter of 2007 when they knew they did not have the necessary operational data from its WSA legacy contracts; (g) Basin had not completed its internal operational transition of its business practices and

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

processes and had not resolved the bulk of the issues concerning its WSA legacy contracts; (h) Defendants' sale of 10 systems was in fact accounted for as an investment activity and not part of Basin's operating cash flow; and (i) The third party finance group that purchased Basin's 10 systems was not "a group of banks."

105.    Further, the third party financing company, to which Basin had allegedly "sold" 10 systems in 2Q07 and as discussed in the August 14, 2007 conference call was not "a group of banks," as Tekulve claimed. In a press release entitled "Basin Water, Inc. – Investor Update," dated April 14, 2008, the Company disclosed, eight months after the false and misleading statement was made, that VL Capital, a third party financing company, "is affiliated with and received funding from CCH Netherlands BV, a subsidiary of CCH International."[12] VL Capital was incorporated in Delaware on June 29, 2007, the last day of 2Q07.

Partial Disclosures of the Company's True Financial Condition and
Continued False and Misleading Positive Statements: November 14, 2007- March 16, 2008

_____

[12] Just two days after Tekulve made the initial false statements regarding VL Capital, on August 16, 2007, CCH International Plc ("CCH"), VL Capital's affiliate and source of funds, issued a press release entitled "Suspension of Shares" announcing that "[CCH] has requested suspension of its shares in light of current discussions in connection with certain of its funding lines." Then on September 19, 2007, Thomson Financial reported that "[CCH] said it plans to sell CCH Europe Gmbh ("CCH Europe"), its principal subsidiary, to chief executive Eren Nil for [$1] to protect its assets from one of its funding banks . . . . The company's problems began when one of its funding banks terminated an agreement with it and CCH Europe on finding that about [$340 million] of lending advanced through the subsidiary had not been used for short-term receivables, but for longer-term commitments. Consequently, the bank had demanded immediate repayment of all funds, totaling about [$500 million], advanced to the company." Finally, on October 24, 2007, CCH issued a press release entitled "Cancellation of Trading" announcing that "admission of the Company's shares to trading on the AIM Market will be cancelled as the [c]ompany has been unable, within the required period of one month, to find a nominated adviser to replace its previous nominated adviser who resigned with immediate effect on 24 September 2007." No further press releases from CCH have been issued and their website has been dismantled to a single page.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

106.      On November 14, 2007, before the market opened, the Company

issued a press release entitled "Basin Water, Inc. Reports Third Quarter 2007

Results; Quarterly Revenues Increase 10% to $5.3 Million Over Prior Quarter,

Takes Reserve." The press release stated in part:

> Basin Water, Inc. today reported financial results for the quarter ended
> September 30, 2007.
>
> *      *      *
>
> While operating contract revenues increased due to newer systems
> coming online, many of these systems were under older, legacy
> contracts with inadequate contract terms and conditions, and priced
> many years before the Company's recently installed business systems
> and practices could be applied. As these legacy projects began
> operating, especially during the hotter summer months, it became
> apparent to the Company that most of these projects would be
> operating at a loss for some period of time. As a consequence, during
> the third quarter, the Company recorded a $4.7 million charge to cost
> of revenues to reserve for future projected losses. This reserve was due
> primarily to poorly priced contracts, increasing waste disposal and salt
> purchase costs and the inability to contractually pass increased costs
> on to our clients.
>
> This charge to cost of revenues is in addition to the reserve previously
> recorded in the fourth quarter of 2006. The prior reserve was recorded
> with the best information available to the company at that time, and
> with only a few months of operating data available. The Company has
> significantly improved its accounting systems during late 2006 and
> during the first half of 2007 including the complete conversion of our
> systems to a new general ledger and management reporting system.
> Based on the new operating history, especially during the third quarter,
> it became apparent that the original reserve was not adequate. The
> Company reviewed each contract's financial performance and
> identified the future expected losses for all contracts, resulting in this
> adjusted reserve balance.
>
> *      *      *
>
> Mike Stark, President and Chief Operating Officer of Basin Water,
> commented, "Last quarter I confidently reported that we had
> essentially completed our transition efforts on establishing internal
> business processes and building the organization to effectively prepare
> for our intended growth and profitability. I continue to hold to that
> confidence. . . .
>
> We believe that the identification and recording of the reserves
> discussed above reflects the last remnants of our previous problems
> related to the Company's capability to properly price and establish

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

appropriate contracting provisions. The reserves will set aside the past problems, and allow the future opportunities and growth to be properly reflected in the Company's financials.

With the transition efforts completed and in place, our financial house is in order, and with the added capabilities and technical support provided by our newly announced relationship with Rohm and Haas, we are poised to complete the transition of this start-up company into a company capable of strong revenue growth with predictable profitability; ready to take advantage of the immense market in which we reside."

107.     On November 14, 2007, Basin also filed its 3Q07 report on Form 10-Q for the quarter ending September 30, 2007, which was signed by Tekulve.

108.     The November 14, 2007 press release was followed by a November 14, 2007 investor conference call ("3Q07 Conference Call") for analysts, investors and media representatives hosted by the Jensen, Stark and Tekulve.

[STARK:] Let me start off the discussion first by saying that while some of you may be disappointed or concerned about the results we reported today, I consider it the completion of the first half of Basin's transition. It is our view that all of our early contracts are now accounted for and we can move forward. I personally believe that Basin Water is now positioned properly to face the future with confidence and with the tools necessary to give the organization a national presence and to take advantage of what we continue to believe is an immense market and a tremendous opportunity.

*     *     *

In March, we announced that we had taken a reserve during the fourth quarter of 2006 for certain contracts we anticipated to have future losses. This was based on the best information we had available at the time. During late 2006 and very early in 2007, we analyzed operating results for each service contract and determined that certain older contracts were operating at net cash flow losses.

These contracts had problematic pricing issues from prior years plus increasing operating costs from waste disposal, salt purchasing and hauling. In addition, these older contracts did not contain the typical terms which veterans of the service industry would ordinarily expect and would allow us to pass these increasing costs to our customers.

It was determined that these losses, in most cases, would continue through the remaining terms of the contracts; therefore, we recorded a reserve for future contract losses in the fourth quarter 2006 in the amount of $3.7 million.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

During the following months in 2007, additional older legacy contracts became operational and were operated during the busy high volume summer months. Based on the newly installed financial tracking systems, especially during the third quarter, it became apparent that the original reserve was not adequate. We once again reviewed each contract's financial performance, this time using an abundantly better database and more operating history, and identified the future expected losses for all contracts, resulting in a $4.7 million increase to the reserves, which was charged to the cost of goods sold in the third quarter of 2007.

*　　　*　　　*

All of the above public company costs, legacy issues and structural transition matters resulted in a third quarter 2007 net operating loss of $9.9 million reported for the third quarter this morning.

*　　　*　　　*

I know each of you is asking how these various activities will impact where we expect to be in the short run. First, it is obvious that the new reserve is intended to eliminate losses from the affected contracts. It is likewise obvious that the larger volume of revenues reserved will dampen overall margin percentages in future quarters, and therefore push out profitability. . . .

*　　　*　　　*

[ANALYST:] Digging into the reserves a little bit on the contract side. Just kind of trying to figure out why this didn't caught in the first pass through. I know that you did have some systems that came on line during the third quarter, but wasn't there sufficient historical data to note these things were running at a loss?

[STARK:] No, I think that's exactly the point, Jesse, and it's the point I think we've been making since I joined the company a year ago. We really – at the end of 2006, we had just started to look at each contract on a well by well basis. We did not have the P&L for every well. And the data we had was, in many cases, anecdotal . . . .

And it really wasn't until the third quarter when we got everything up and running – you know from the previous call I certainly didn't expect to take a reserve in the third quarter or I would have told you all about it.

*　　　*　　　*

[STARK:] So really, it wasn't – we weren't able to predict it in 2006. We did the best we could. We have it now. We've got our arms around it. And I'm sure there's some out there on the call that are skeptical and who are saying, well, how do you know you have it all now? And the only thing I can tell you is that the data we have is much improved over the data we had then. And therefore, we believe we have it.

- 59 -

[ANALYST:] It isn't just – I guess I'm missing the complexity here. Wouldn't you just say that it's sort of a calculation of – the salt costs, transportation costs? You guys know the parts per million that you're bringing it down to. You know how contaminated the well is. Is that – you couldn't accurately predict from that?

[STARK:] We didn't have the data amassed, Jesse. Again, when I got to the company in October [2006] and the company had come through its IPO and we started to go through our processes, one of the things that was abundantly clear was that we weren't tracking our contracts on a well-by-well basis. So we didn't have all of the data. And as we began to amass the data, it wasn't as accurate as it is now, with a much beefier accounting department and better accounting systems and better reports. I mean, it is not that complex. You're absolutely right. None of us think it's a mystery. It's just that we did not have the data. And that's why we feel so much more comfortable that we have it now.

And, again, there are many reasons for why those wells are losing money. It's not all in one bucket. And we had to analyze all of the reasons as well and see what could be corrected and what couldn't be corrected immediately. But we've got it now, Jesse.

[ANALYST:] Okay. You have 43 on the ground and permitted. Now have all 43 of those run at this point? So that you have the data for each and every well?

[TEKULVE:] Yes. We have the data for each of the wells. This is Tom. And another thing I'll say is that this was a very long process as we went through and analyzed these wells. We had – just to give you a little bit of the process here. We had each well that is assigned to a service technician and a service manager. Each well is also assigned to a process engineering manager and to a client relations sales manager. And we had all three of these folks reviewing each contract exactly where they see that contract based on the prior history as well as where they see it going in the future.

[STARK:] And we certainly didn't have that structure in place at the end of 2006.

*       *       *

[STARK:] [W]e can price based on the competitive alternative and make the kind of margins that we're talking about. The projects that we're talking about that weren't priced properly are priced well below the competitive alternative. So we have an – we still have – we don't have to raise prices in order to cure the problem. We just have to price appropriately for the services that are being rendered. So I don't see pricing as an issue. That's point number one.

*       *       *

[STARK:] . . . I believe that we have both the technical skills and now the accounting skills to be able to predict our future and manage it. I

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

think that's a big difference. I think in 2006, frankly, we didn't know where we were. In 2007, we're able to predict history extremely well. And in 2008, it's up to us to manage and control the future of the business.

\*       \*       \*

[STARK:] I take a deep sigh of relief that we actually do know where we are and where we're going and how we're performing and that we feel as though we can perform. We're not lost in the woods or searching for "why is that number at that level?" We understand now.

\*       \*       \*

[ANALYST:] Yes, just one last question on the reserves taken. Were those for new systems or were those added reserves for the ones taken in the fourth quarter of '06?

[TEKULVE:] Those were all old contracts, some of which we had already reserved for in the prior year which had a greater loss. Some were contracts that were in place in the prior year but didn't come on line and begin operating until this year.

109.     During the 3Q07 Analyst Call, defendants minimized the impact of

the 3Q07 Reserve and made the following reassuring statements to the market:

- As a matter of fact, three months ago, I confidently indicated that the transition was, for the most part, completed, and so it was. . . .

- We were also preparing the company for the alliance we have established with Rohm and Haas . . . .

- We have successfully reentered the marketplace with a revamped sales organization and with our internal business systems developed to support Basin's expected growth.

- We have also corrected contract weaknesses in our water service agreements.

- This puts Basin Water in a much healthier position to take advantage of the opportunities in front of us. We feel we have put the old legacy problems behind us.

- It is very important to me that those of you who have been following Basin Water over the past year find what I have to say about basin as consistent. I have repeatedly said that I believe that this company has

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

the potential to be a leader in the water services market. I believe that the idea of providing technological solutions to solve specific wellhead problems on the long term pay-for-performance basis was a concept being demanded by the market.

- [O]n the canal. You know, it's a very good project. We have had proposals on it valuing at what we think are very good numbers on it, and what we're trying to do is maximize the value for the shareholders of Basin Water right now, and we expect to do that shortly. So I think it is an extremely good deal for the shareholders and when it gets done, you'll see.

- We have immensely improved Basin Water's capacity to meet these needs through our business processes, our acquisition of Mobile Process Technology and, with the great new alliance we have with Rohm and Haas.

- [W]e are no longer focused only on fourth quarter profitability. Our focus is more on accelerating our growth and achieving greater profitability in a much shorter period of time. So, as I discussed earlier, we are still targeting revenue growth in the 30% range for 2007. But the likelihood of profitability will be pushed into 2008.

- [W]e expect solid revenue growth and profitability in 2008 with the significant movement of Basin Water from its start up past into a profitable growth company as we all expected.

Questions and Answers

[ANALYST:] And you said you were targeting profitability in '08. Was that full year or just hitting that one quarter?

[STARK:] Full Year.

[ANALYST:] Okay. Full year. I'll get back – okay, thanks. I'll get back in line for any follow up.

[STARK:] Full year – not just getting – reaching profitability. We expect to be profitable for the year.

[ANALYST:] Thanks, Mike.

110.    In order to counter the news of the additional reserve and keep

Basin's share price from declining further, defendants simultaneously announced

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

with the 3Q07 Reserve the Rohm and Haas agreement in its Form 8-K filed with the SEC on November 15, 2007.

111.    Defendants continued to infuse false positive statements and half truths about Basin into the market-place following the 3Q07 Reserve and the sell off of the Company's shares that ensued. Several analysts picked up on defendants' positive statements and did not downgrade Basin, and some even expressed agreement that the 3Q07 Reserve "may mark the turning point" for Basin's WSA legacy contracts. Analyst Michael E. Gaugler of Brean Murray Carret & Co. issued a report on November 15, 2007 entitled "Reports 3Q07 Results, Reiterate Hold Rating" which stated that despite Basin's unexpected charges, "at current share price levels, it would not be unreasonable to see some support, particularly from the company itself via its stock-repurchase program. . . . it appears suitable controls to track P&Ls on each contract are now in place, which should prevent future surprises like those seen in 3Q07."

112.    Likewise, analysts Debra G. Coy and Heike M. Doerr of Janney Montgomery Scott LLC ("Janney"), issued a report on November 15, 2007 entitled "Upgrading to NEUTRAL; 3Q Results; Back to Realistic Fair Value for this Start-Up" which also downplayed the significance of the 3Q07 Reserve and that the reserve had put the issue of older contracts behind the Company: "we are upgrading Basin Water to NEUTRAL, as we believe the stock more appropriately reflects the

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

company's earnings capability at these levels. . . . The reserve is to cover anticipated operating losses for the multi-year remaining life of those contracts."

113.    On December 28, 2007, the Compensation Committee of the Board of Directors of Basin approved option grants and cash bonus payments for the 2007 fiscal year to be paid to the Company's executive officers, including Jensen, Stark and Tekulve. Option grants and bonus payments were based on an evaluation of each executive officer's performance during 2007, and the achievement of certain corporate objectives, including the consummation of several significant transactions during 2007. The option grants were also made to the Company's executive officers to provide incentives for performance in the coming fiscal year. The total option grants made and the bonuses to be paid to each executive officer are as follows:

| Name | Title | Shares Underlying Option | Amount of Bonus |
| --- | --- | --- | --- |
| Peter L. Jensen | Chairman & Chief Executive Officer | 55,000 | $83,000 |
| Michael M. Stark | President & Chief Operating Officer | 50,000 | $80,000 |
| Thomas C. Tekulve | CFO, CAO, Treasurer & Assistant Secretary | 29,000 | $50,000 |

114.    On the same day and only six months after acquiring the water assets, on December 28, 2007, Basin issued a press release announcing that "Basin Water Sells Rights to Southern California Water Conveyance Assets to Empire Water Corporation; Deal Structure Provides Shares in Acquirer and Treatment

- 64 -

System Sale While Providing Opportunity for Development of Assets," a transaction negotiated personally by Jensen.[13]

> [B]asin Water Resources received 6 million shares of Empire Water Corporation at the first closing. It will receive an additional 6 million shares at a second closing to occur before June 30, 2008. These shares will be subject to a one-year lockup. As a second part of the transaction, Empire Water purchased a 1000 gallon per minute (gpm) nitrate removal system from Basin Water that will be held in inventory until it is deployed at a later date.

115.    Analyst Gibson of Nollenberger issued a positive report on January 2, 2008 entitled "Empire Water Acquires [Basin] Rights to Water Resource Assets" following the news and rated Basin a "Buy": "In our opinion, the technology, management team and finances are in place to help solve a multi-billion dollar worldwide market need for clean water."

116.    On February 6, 2008, analyst John Quealy, CPA of Canaccord issued a report on February 6, 2008 entitled "Meeting with Management; Maintain Hold, $9.50 Target" which stated:

> It appears that clear strides have been made in terms of sales force quality, contract pricing, process and cost controls, along with core administrative/financial systems.

> After 15 months on the job, Mike [Stark] appears to have cleared out much of the earlier infrastructure inadequacies within the company and gives us a good measure of confidence that the "heavy lifting" is indeed concluded internally, sooner than our expectations.

---

[13] According to Basin's Schedule 13D/A, filed with the SEC on January 7, 2008, "the Reporting Person (through its CEO Peter Jensen) came into contact with representatives of [Empire Water] and negotiated a transaction . . . with [Empire Water]".

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

117.     On February 19, 2008, Basin issued a press release announcing that it named both Stark as Chief Executive Officer, replacing Jensen, who remained on Basin's Board of Directors and joined Empire Water:

> Basin Water, Inc. today announced the appointment of Michael M. Stark as Chief Executive Officer and the resignation of Peter L. Jensen as Chief Executive Officer and Chairman of the Board, effective February 19, 2008.
>
> *     *     *
>
> Mr. Jensen, who will remain a member of the Board of Directors of Basin Water, plans to join Empire Water Corporation (EWCR.OB), which was recently created to own and develop water resources in Southern California. Empire owns the West Riverside Canal Company, which produces and distributes irrigation water in Riverside County, California. Basin Water presently owns approximately 32% of the outstanding shares of Empire Water Corporation.

118.     Basin continued to announce positive news. On February 20, 2008, Basin issued a press release announcing that it signed an exclusive agreement with Purifics ES, Inc. to market technology for drinking water applications with exclusive right obtained for selected states in the U.S. As part of the agreement, Basin purchased a Purifics system for use in validation studies with prospective customers. The release announced that Basin and Purifics were working toward a definitive agreement to promote the sale and development of Purifics' technology, and that they were co-sponsoring a technology conference on Purifics' Photo-Cat(TM) systems to be held in Henderson, NV, on March 6, 2008.

119.     On February 26, 2008, Basin issued a press release announcing that it received approval for the installation of a high-efficiency ion exchange system to remove nitrate at a new potable water source for the Port of Walla Walla, WA:

"The contract marks the first Basin Water installation in the State and is part of the company's announced plans to grow operations nationwide while also developing new technologies and applications for their water treatment technology + services business."

120.     On March 12, 2008, Basin issued a press release announcing the appointment of Katzmann as Chairman of the Board of Directors, effective March 6, 2008. Katzmann was a founding investor of Basin, and served on the Board of Directors since August 2001.

121.     Analyst John Quealy, CPA of Canaccord issued a report on March 14, 2008 entitled "Q4/07 Preview" which stated:

> Overall, we look for realignment and restructuring efforts to be winding down, along with a constructive outlook on growing new business lines and geographies in 2008.
>
> *          *          *
>
> While this event had been widely telegraphed since Mike's arrival in late 2006, we view the official announcement [of Stark's promotion] as a positive indicator of Basin's transition from start-up mode toward larger scale commercialization efforts. Other recent organizational efforts include the appointment of a new board chairman, the recent hire of an experienced sales manager to cover the western US, and the addition of a seasoned marketing vice president.

122.     The foregoing statements made by defendants between November 14, 2007 and March 16, 2008, were false and misleading because: (a) Basin had not "completed its transition efforts on establishing internal business processes and building the organization to effectively prepare for its intended growth and profitability" because defendants knew that they had not accounted for all then-

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

known problematic WSA legacy contracts; (b) The Company did not have a reasonable basis to state that "the reserves will set aside the past problems, and allow the future opportunities and growth to be properly reflected in the Company's financials" when it did not have operational results from known problematic WSA legacy contracts; (c) The Company did not have a reasonable basis to state that "all of our early contracts are now accounted for and we can move forward" when it did not have operational results from known problematic WSA legacy contracts; and (d) The Company did not have a reasonable basis to state "we actually do know where we are and where we're going and how we're performing and that we feel as though we can perform" when it did not have operational results from known problematic WSA legacy contracts.

March 17, 2008 – August 8, 2008

123.    On March 17, 2008, Basin issued a press release announcing its 2007 year end results entitled "Basin Water, Inc. Reports Year End 2007 Results; Twelve- Month Revenues Increase 10% to $18.8 Million":

> For the year ended 2007, revenues increased by 10% to $18.8 million compared to $17.1 million for the year 2006. For the year, system sales revenues were $13.5 million, compared to $13.9 million in the same twelve-month period in 2006. Operating contract revenues of $5.3 million increased by 66% on a year over year basis.

> The increase in operating contract revenues was due primarily to increases in the number of water treatment systems that came on line during the year 2007 compared to the prior year and due to additional contract revenues generated by the purchase of Mobile Process Technology Co. (MPT) on September 14, 2007.

*       *       *

- 68 -

Other income of $5.1 million primarily reflects interest income of $2.7 million earned on the Company's cash balance and a gain on sale to an affiliate of $2.5 million recorded in the fourth quarter of 2007. This gain was as a result of the assignment of the Company's right to purchase certain water assets to Empire Water Corporation. As we announced in the fourth quarter 2007, Empire Water raised equity in order to purchase these water rights from Basin. Basin received 6 million shares of stock, or approximately 32% ownership in Empire Water.

\*       \*       \*

Other income of $3.0 million in the fourth quarter of 2007 primarily reflects interest income of $0.6 million earned on the Company's cash balances and a gain on sale to Empire Water of $2.5 million recorded in the fourth quarter of 2007 as a result of the assignment of the Company's right to purchase certain water assets to Empire Water.

124.     The March 17, 2008 press release was followed by a March 17, 2008 investor conference call (the "4Q07 Conference Call") for analysts, investors and media representatives, hosted by Stark and Tekulve, wherein they again reasserted the WSA legacy contract issues were behind the Company and that Basin expected to see strong growth:

[TEKULVE:] We consider 2007 as a transition year for Basin Water. And Mike will elaborate and discuss this a little later on today's call. Our annual revenues were $18.8 million, an increase of $1.7 million or 10% growth over the prior year. The growth was primarily due to increases in our contract revenues. We booked a total of $4.1 million in new system sales, which brings with it an additional $8.1 million in contract revenue backlog. The important point of the fourth quarter revenues achieved this year is that we are now seeing stronger gross margins from system sales.

We are encouraged to begin seeing an improvement in our project margins and recognize this as a result of our developing internal business processes that we have implemented throughout the 2007 year, and of which we are continuing to refine and improve. It will take time for these positive results to be evident in our contract revenues, because the newer, improved margin contract revenues are currently a smaller percentage of our contract mix. But as we go forward, these will become more of a factor and will reduce the impact of the older reserved legacy contracts, which should now have no material gross margin impact. Now, I'll focus in gross margins for the year.

\*       \*       \*

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

1
2
3
4

As we announced during the fourth quarter, we were successful in developing a water resource opportunity and selling it to a newly-formed company called Empire Water Corporation. Empire Water raised equity in order to purchase these water resource rights from Basin. Basin received $0.2 million in cash to cover our out of pocket costs plus six million shares in Empire Water, giving Basin Water a 32% ownership in Empire Water. We recorded a gain of $2.5 million this quarter representing the fair value on a net basis of this stock.

5
6

\*     \*     \*

We also recorded an increase of $4.2 million in intangible assets as a result of patents and technology know-how we obtained in the MPT acquisition.

7
8

\*     \*     \*

9
10
11
12
13
14
15
16

[STARK:] In the process of effecting their transition, we went to tremendous effort to establish the needed discipline and fiscal controls so that this company could compete and fulfill its mission. We have implemented pricing and proposal approval policies, built a cost control process, upgraded accounting systems and processes, established well P&Ls to monitor our water service agreements known as WSA's, and their economic performance. We have developed and implemented budgeting and forecasting models. We have developed budgeting, forecasting and reporting processes at the product line and departmental levels; created and installed internal building and purchasing controls; revamped our quality assurance and quality control procedures; made significant process on our Sarbanes-Oxley effort impacting the entire organization's processes and procedures.

17
18

\*     \*     \*

Basin is on track for long-term sustainable and predictable growth. I will not attempt to tell you exactly when you will see profitability in 2008. But I will tell you that in my 43-year history in this industry, I have seen many opportunities and have had the pleasure of growing many operations. In my opinion, the opportunity at Basin Water ranks with the best of them. Now back to the transition.

19
20
21

\*     \*     \*

22
23
24
25

[ANALYST:] Let me try to ask the question this way. So you have been there 16 months. In terms of, you have gone down into the details on most of the functions of the company, do you feel that you've got a good grasp on the current cost structure of the company and older contracts that were unprofitable? Do you think we are fully passed at least that stage of it?

26

[STARK]: I do. I believe that, that as we came to the end of the third quarter, we had a very good idea of what legacy projects look like. We had a very good idea of what caused those legacy issues. We put in place the systems that would prevent them from recurring. . . . And the history that we are getting now on our wells and our ability to track

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

1  them and the consistency with which we can predict their month to
2  month results gives me confidence that we can properly cost WSAs
   going forward ask achieve the 30% like margins that I referred to.

3  [ANALYST:] Okay. And Tom, I thought I heard you say you broke
   several contracts. I thought you had only actually given up on one.
4  Was there more than one that was backed out?

5  [TEKULVE:] There were several that, that we evaluated and actually,
   some had a natural renewal period in them and we let them drop off.
6  There is several.

7  [ANALYST:] So that was just coming at their normal renewal then?

8  [STARK:] Hey, Bill, this is Mike Stark. Early on, we said that we had
   to be careful as a services company, not to walk away from, from
9  commitments. Because I mean, after all, when you enter into a
   commitment and you promise guaranteed, low life cycle costs, it
10 would not speak well for us as a company if we walked away from
   those commitments. But there were half a dozen or more contracts that
11 we felt very comfortable would not adversely affect us in the
   marketplace long-term and were just not not fixable from our
12 perspective, and we did walk away from those.

13 [ANALYST:] Is that what the reversal in the fourth quarter was? Or
   have you made progress on the cost side as well?
14
   [TEKULVE:] No, in fact we anticipated some of these. The reversal
15 that you saw in the fourth quarter was a natural, I hesitate to use the
   term, reversal. What it was was an application of the loss that we
16 incurred on those contract revenues applied against the balance sheet
   reserve that we had set up.
17
   [ANALYST:] Okay.
18
   [STARK:] We didn't reduce the reserve by taking it to the bottom line.
19 We reduced the reserve by applying it to the contracts in question.

20 [ANALYST:] Then I guess the last question, with regard to – I know
   you guys had said you had a couple of big customers. Who, who is VL
21 Capital? And then, who is Water Services Solutions? Are those
   metropolitans or municipalities?
22
   [TEKULVE:] Well, the VL Capital, if you were on the call back in the
23 second quarter of 2007, you will recall that we had bundled a group of
   contracts of 10 systems that we sold to a financing group and that is
24 this who is VL Capital. And of that – I don't know if you recall that – I
   do, I do, I'm sorry, that's right. And Water Services Solutions.
25
   [STARK:] VL Capital really represents 10 customers that we have
26 under WSA.

   [ANALYST:] Got you. Okay.

- 71 -

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

[TEKULVE:] They're the owners of the assets.

[ANALYST:] Okay, and then last question, I'll get back in the queue. The issuance of $3.4 million of notes receivable? What was that in connection with?

[TEKULVE:] That was actually in connection with the VL transaction. It was a combination – the sale to VLC was a combination of cash and a long term note receivable.

[ANALYST:] To VLC or to the ten entities on the other side?

[TEKULVE:] To VLC, the owners of the equipment.

125.    Analyst Gibson of Nollenberger issued a report on March 18, 2008, after conversations with Basin's management, which stated:

"The company wiggled out of six legacy contracts at natural renewal points and realized a $692,000 benefit after adjusting previously booked reserves. Basin Water also recognized a $2.5 million gain by selling water-related assets to an affiliated company, Empire Water. The 4Q07 loss would have been ($0.18) per share without the gain.

*      *      *

Under Mr. Stark, Basin Water identified contractual deficiencies in operating system flows, revamped its sales force, reorganized field services, instituted a disciplined pricing model, installed appropriate quality procedures, and created a proposal approval procedure, account management system and forecasting model. It took charges for early contracts in both the 4Q06 and 3Q07.

Sales improved from $1.6 million in 1Q07 to $2.6 million in 2Q07 (after backing out the sale of ten systems previously under lease for $3.8 million) and $5.3 million in 3Q07. We think the company can grow revenue and profits year-over-year at a rapid rate for years to come."

126.    On March 26, 2008, Basin announced the finalization of a ten-year "technology + services" agreement with California Water Services Company (Cal Water) in its Salinas District for the removal of nitrates from groundwater at the District's 65-01 well site.

127.     On April 14, 2008, Basin issued a press release entitled "Basin Water, Inc. – Investor Update" to reassure investors as to the appropriateness of its financial arrangements with VL Capital, and its transactions with Jensen and his new company, Empire Water:

Basin Water, Inc. announced today the following information regarding certain financing and purchase arrangements and aspects of its recently-announced Empire transaction.

Early last year during conference calls held by Basin Water on March 29, 2007 and on May 14, 2007, Basin Water disclosed its intention to enter into third-party financing arrangements whereby Basin Water customers would enter into long-term lease agreements, and the underlying treatment systems would be purchased by outside financial entities. Basin Water would continue to service and maintain those treatment systems for its customers through water services agreements.

In 2007, Basin Water entered into two such finance and purchase arrangements, the first of which was discussed in Basin Water's August 14, 2007 press release. Basin Water also discussed and answered questions about this finance and purchase agreement during its conference call held on the same day. As noted in its August 17, 2007 press release, this finance and purchase arrangement involved Basin Water selling ten systems which had been previously placed with five Basin Water customers, including the City of Avondale and the City of Mesa in Arizona, the City of Modesto, the Mission Springs Water District and California Water Services Company. For each of these water treatment systems, Basin Water had executed a long-term water services agreement with these customers to service and maintain those water treatment systems. As noted in the Basin Water Form 10-Q dated August 14, 2007, Basin Water received $500,000 on execution of the purchase agreement and remaining amounts due Basin Water are secured by the treatment systems and lease agreements with our customers noted above.

Later in 2007, Basin Water entered into a similar finance and purchase arrangement with another financial entity for the purchase of water treatment systems that had been placed at two Basin Water customers, Cottonwood, AZ and the East Valley Water District in Southern California. Basin Water has long-term water services agreements with both of these customers to service and maintain their treatment systems.

In the Basin Water 10-K filed for the year-ending December 31, 2007, we provided a table listing the Basin Water customers that accounted for more than 10% of our revenues for the year 2007. The first two customers listed in the table, VL Capital, LLC, which is affiliated with and received funding from CCH Netherlands BV, a subsidiary of CCH International, and Water Services Solutions, LLC, which is affiliated

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

with and received funding from National City Energy Capital, a subsidiary of National City Corporation, are the parties associated with the two finance and purchase transactions discussed above. These two financing entities became Basin Water customers because we sold the treatment units to them, even though the treatment units continue to be utilized by water providers with whom we have service relationships. In 2007 these sales of water treatment units to the two financing entities accounted for 26% and 14% of our revenues, respectively. However, as noted above, for each water treatment unit sold to these entities pursuant to these finance and purchase arrangements, Basin Water retained its water services agreement and relationship with each water provider customer for whom the water treatment unit was deployed. Those water service agreements require Basin Water to provide service and maintenance on behalf of our water provider customers for the water treatment systems deployed at our customer wells, and Basin Water continues to have a direct relationship with all of our water provider customers related to these projects. Basin Water expects to enter into similar financing arrangements in the future.

As announced in our December 28, 2007 press release, Basin Water completed the sale of the rights to certain water conveyance assets. These assets, held by a Basin Water subsidiary, included an 18-mile water conveyance canal, rights to pump water from the San Bernardino County Basin, other equipment, and other tangible and intangible property that were held by the West Riverside Canal Company and the West Riverside 350 Inch Company. As part of the transaction, Empire Water purchased a 1000 gallon per minute (gpm) nitrate removal system from Basin Water that will be held in inventory until it is deployed at a later date. At the time of the closing, Basin Water received a $300,000 down payment on that unit, and Basin Water will receive the balance at the time the unit is deployed or no later than June 30, 2008.

128.    Based upon Basin's April 14, 2008 press release providing information regarding its financial arrangement with VL Capital, analysts Debra G. Coy, Heike M. Doerr and Christopher J. Purtill of Janney issued a positive report on May 2, 2008 entitled "Sell-off Overdone, Update to BUY."

129.    On May 6, 2008, Basin issued a press release announcing the appointment of Susan Hegarty Snow ("Snow") to its Board of Directors effective May 6, 2008, as a Class I Director with an initial term expiring in 2010. Snow was also appointed to serve on the Company's Audit Committee and Nominating and

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

Governance Committee. In connection with Snow's appointment, Russell C. Ball resigned from the Basin Water Board of Directors. Ball served on the Board since February of 2006.

130.    On May 6, 2008, Basin issued a press release entitled "Basin Water Making Excellent Progress Implementing New Sales Process, CEO Michael Stark Tells Annual Meeting; But Long Lead Time for New Contracts Will Be Reflected in First Quarter Revenues, He Says," which stated in pertinent part:

> Mr. Stark also said that the company's balance sheet remains strong. The company has no debt outstanding, and does not expect to borrow to meet its cash needs in the foreseeable future, he said. In addition, Mr. Stark noted that the company's first quarter cash usage will be greater than the fourth quarter of 2007 in part due to a number of one time items; however, the company expects to have sufficient cash to fund operations for the foreseeable future.

131.    On May 8, 2008, Basin issued a press release announcing that it had been awarded a new contract by Millersview-Doole Water Supply Corp. of Millersview, TX, pending successful completion of a pilot demonstration, and that the contract represented the first new municipal business won by Basin's recently formed Southwest Region.

132.    On May 12, 2008, Basin issued a press release entitled "Basin Water, Inc. Reports Higher First Quarter Sales and Increased Loss, Which Results from Strategic Expansion of Corporate Resources to Support Growth." The press release stated:

> Basin Water, Inc., announced financial results for its first quarter ended March 31, 2008. Sales in the quarter rose 87% to $3.0 million, compared with $1.6 million in the year earlier quarter. Gross margins

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

on system sales improved significantly compared with the prior year quarter.

\* \* \*

"These results do not reflect our expectations for the year as a whole," said Michael Stark, chief executive officer. "In recent months we have substantially expanded essential corporate personnel and resources. We now have proper management systems in place to support profitable growth in sales. As new sales are booked, organizational leverage will bring administrative expenses to appropriate levels as a percent of sales.

\* \* \*

"We also have created an array of new business systems and processes that give us much better control over our business. We have invested significantly in systems and people to create and support a robust organization that knows how to evaluate customer needs, design solutions, and implement them profitably. Additionally, we are transforming ourselves from a regional municipal water treatment company to a national business that serves both potable water and industrial markets," he said.

For the quarter ended March 31, 2008, the company reported cash and cash equivalents of $27.3 million, compared with $35.5 million at the beginning of the quarter. That rate of use of cash is not expected to continue during the remainder of the year, Mr. Stark said. "Our higher than normal use of cash in the first quarter is due in part to our higher than normal SG&A expenses. The company believes it has sufficient cash to support its operations and execute its business model, without need either for borrowing or for an additional equity offering for the foreseeable future," he said.

133.     The May 12, 2008 press release was followed by a May 12, 2008 investor conference call (the "1Q08 Conference Call") for analysts, investors and media representatives, hosted by Stark and Tekulve in which the Company agreed with analysts that Basin could see revenues between $26 million and $36 million in FY08:

[TEKULVE:] As we announced last week, our revenues would show good growth over the prior year quarter but would be less than the fourth quarter of 2007. Today we announced revenues for the quarter at $3.0 million compared with $1.6 million for the first quarter of 2007, an increase of 87% with a growth of 49% in system sales and 137% growth in contract revenues. System sales recognized on a percent of completion basis included an increased number of new

systems sold in the quarter compared to the prior year quarter. The contract revenue growth reflects the increases in the number of water treatment systems operating under contract compared to the prior year as well as contributions in revenues from the MPT acquisition made last year September of 2007.

As we have discussed over the last several quarters, we have newly established business systems in place to properly price our projects on a go forward basis.

The older legacy contracts we have spoken about in prior earnings calls covered by reserves did not negatively impact our overall gross margin this quarter. Again, we are encouraged by the improvements we see in the gross margins and recognize that the internal business processes that we have implemented over the last year are showing positive and improving in our results. Due to the nature of our contract revenues, it will take time for the positive results to become evident. However, as our newer improved margin contract revenues grow, they will present a growing percentage of our contract mix and will reduce the impact of the older reserved legacy contracts which should now have no material gross margin impact.

*        *        *

[STARK:] Our gross margin also will benefit because the contracts we are writing today are expected to cover our expenses and provide a 30% or higher gross operating margin. That is not true of many of the legacy contracts, which is why, as you know, we took a charge against earnings to cover those operating costs that won't be covered by project revenues. Projects that we hook and bring into the boat in the future should pay their own way and more.

Right now, several of the analysts or most of the analysts who report on Basin Water have us bracketed somewhere between $26 million and $36 million in total revenue for the year. And we don't think that's unreasonable.

134.     Analyst John Quealy, CPA of Canaccord issued a report on May 13, 2008 entitled "Q1/08 Review," again repeating Basin management's assessment "that current consensus revenue estimates ranging between $26-36M for 2008 are not 'unreasonable.'" Also on May 13, 2008, analysts Debra G. Coy, Heike M. Doerr and Christopher J. Purtill of Janney issued a report entitled "First Quarter Results; the Wrong End of the Telescope" which also stated that Management . . .

said that Street estimates, ranging from $26 million to $36 million, were "reasonable."

135.    On May 20, 2008, Basin announced that it reached an agreement with Water & Earth Sciences for a mining water treatment system at a Canadian mine site in Ontario, Canada, the contract is first large-scale mining water treatment project for Basin:

> This agreement represents Basin Water's first large order in the industrial market following the acquisition and integration of Mobile Process Technologies, Co. last year.

> According to Michael M. Stark, President and Chief Executive Officer of Basin Water, the WESA agreement signals progress in Basin Water's strategy to bring a new dimension of water treatment technology, expertise and service to the industrial sector.

136.    On May 27, 2008, Basin issued a press release announcing the appointment of Stark, to Basin's Board of Directors, as a member of Class I of the Board.

137.    Then, on June 23, 2008, Basin issued a press release announcing the appointment of Tekulve as VP of Finance - Business Development and W. Christopher Chisholm as VP and Chief Financial Officer of the Company.

138.    On July 28, 2008, Basin issued a press release announcing that it would release its 2Q08 financial results on August 11, 2008, and host an investor conference call that same day to discuss financial results and operations, which Basin subsequently cancelled.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

139.     The foregoing statements made by defendants between March 17, 2008 and August 8, 2008, were false and misleading because: (a) defendants had no reasonable basis to state that Basin "is on track for long term sustainable and predictable growth;" (b) defendants had no reasonable basis to state that "the Company's balance sheet remains strong;" and  (c) defendants had no reasonable basis to claim that analysts' consensus estimates of revenues between $26 and $36 million for FY08 were "not unreasonable."

The Truth Is Revealed

140.     Two weeks later on August 11, 2008, Basin issued a press release entitled "Basin Water Delays Quarterly Financial Report and Discloses That Its Audit Committee is Reviewing Accounting; Company Also Cancels Scheduled Conference Call":

> Basin Water, Inc. announced today that it will not file its quarterly report on Form 10-Q for the quarter ended June 30, 2008 with the Securities and Exchange Commission by the required deadline, which is today, and that it has cancelled its previously scheduled conference call to discuss second quarter financial results.

> The Company also said that the Audit Committee of its Board of Directors is conducting a review of the Company's accounting for certain specific transactions, and that the Audit Committee has retained independent legal counsel and accountants to assist in the review. The Company has delayed the filing of its Form 10-Q pending the completion of the Audit Committee's review.

> Based on the preliminary results of the Audit Committee's inquiry to date, the Company believes that it may be necessary to restate previously issued financial statements for certain periods as a result of the Company's revenue recognition relating to certain specific transactions. The Company plans to update this disclosure after the Audit Committee's inquiry has been substantially completed. Basin Water said it will disclose its second quarter financial results and file its Form 10-Q for the second quarter of 2008 as soon as reasonably practicable.

- 79 -

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

Separately, the Company also updated guidance it gave during its first quarter conference call regarding expected revenues for 2008. During that call, the Company indicated that analysts' estimates that the Company would achieve revenues of $26 million to $36 million for fiscal year 2008 were not unreasonable. The Company no longer believes those estimates will be achieved and does not intend to provide any further revenue guidance for the year.

                              *       *       *

Basin Water said that it has filed a Notification of Late Filing on Form 12b-25 with the Securities and Exchange Commission today with respect to its second quarter Form 10-Q. Basin Water anticipates receiving a notice Staff De-termination letter from NASDAQ in the near term, in accordance with NASDAQ's standard practice, for the Company's failure to comply with NASDAQ's filing requirements. The Company intends to request a hearing before a NASDAQ Listing Qualification Panel, which will stay any suspension or delisting action by NASDAQ pending the outcome of the hearing.

141.     Roth Capital Partners issued a report on August 12, 2008 entitled "Basin Water, Inc. Suspending Coverage" which stated:

We initiated coverage on [Basin] in May 2007 under the thesis that its operations were on the verge of turning around, after a disappointing start as a public company. Since that time, the company's fundamentals have not improved, but rather have deteriorated meaningfully. We believe Monday's announcement of a impending restatement adds incremental uncertainty to the outlook.

142.     Analysts Debra G. Coy, Heike M. Doerr and Christopher J. Purtill of Janney issued a report on August 12, 2008 entitled "Research Note: Basin Water, Inc. Suspending Rating on Recent News" which stated:

Basin Water has traded down over 40% intra-day today after the company announced that it is reviewing accounting methods applied for "certain specific transactions" and is likely to restate previous financial statements. . . . we temporarily suspend our rating on Basin Water. We continue to believe that Basin Water is still suffering from historically weak financial management. We believe that this most recent financial review is a result of the appointment of a new CFO who is significantly more experienced than the company's previous CFO. Indeed, we are less concerned about the accounting restatements than the company's announcement today that it no longer thinks it will meet current revenue projections and is suspending guidance on its revenue outlook. Overall, Basin Water is still a start-up company that went public too soon and is continuing to struggle to establish the operating and financial structure that can support the growth it has

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

hoped to achieve.

143.    Analyst Gibson of Nollenberger issued a report on August 18, 2008

entitled "Possible Earnings Restatement; Late Filer; Suspending Estimates &

Rating," which stated:

> We are suspending our rating and earnings estimates until the company is current with its SEC filings. Our rating was neutral prior to the delay.
>
> CEO Michael Stark stated on the 1Q08 call that analyst revenue estimates of $26-36 million were not unreasonable. It no longer believes those estimates will be achieved. Our 2008 estimate was a $14.4 million loss on revenue of $30.3 million.
>
> *        *        *
>
> The time to cash flow breakeven is hindered by legacy contracts with problematic pricing issues.
>
> *        *        *
>
> In our opinion, none share Basin Water's focus or potential growth rate.

144.    On September 4, 2008, it was reported that Basin filed for a hearing

on its Nasdaq staff determination latter which is scheduled for October 16, 2008, by

which time Basin expects that it will have made substantial progress on its potential

delisting as of August 25, 2008, due to its failure to file its 2Q08 Form 10-Q.

**BASIN'S MATERIALLY FALSE AND
MISLEADING FINANCIAL STATEMENTS**

145.    Additionally, to materially overstate Basin's revenues and

operating cash flows and materially understate its expenses and losses, defendants

caused Basin to employ several improper accounting schemes in violation of

GAAP and SEC guidance, including the following: (a) Basin improperly

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

recognized revenue in connection with a transaction with Shaw, which overstated net revenue by $2.5 million in 2006 and $0.2 post-2006; (b) Basin prematurely recognized $3.4 million in revenue and $500,000 in net income from a long-term finance agreement – funded by Basin – with a new customer;[14] (c) In connection with its financing of 10 water treatment systems that Basin operated for other third parties, Basin falsely reported on its statement of cash flows that the source of its $3.4 million in negative cash flow was Basin's investing activities rather than its operating activities; (d) Basin failed to disclose material contingent liabilities with respect to large legacy contracts, even though defendants knew that its legacy contracts had incurred substantial operating losses prior to and during the Relevant Period. Defendants revealed Basin had taken a $5 million expense charge to account for previously undisclosed losses under these contracts; (e) Basin improperly recognized net revenue of approximately $2.5 million in connection with a transaction with Shaw. (f) In addition, Basin violated numerous GAAP and SEC disclosure requirements that helped conceal related and relevant facts.

146.    These accounting shenanigans resulted in the material overstatement of Basin's revenues and cash flows from operating activities and understatement of Basin's expenses and losses in its financial statements that were disseminated to the public and filed with the SEC.

---

[14] The customer, VL Capital, was not in the water business. Basin reported in its Form 10-K for the year ended December 31, 2007, that VL Capital was its largest customer in terms of revenue for 2007, generating 26% of Basin's reported $18.8 million of revenue for the year.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

147.    GAAP are principles recognized by the accounting profession as the conventions, rules and practices that define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure that would be duplicative of disclosures accompanying annual disclosures, per 17 C.F.R. §210.10-01(a).

148.    Basin's representations that its financial statements were properly stated and a fair representation of Basin's financial condition were false and misleading, as the financial information was neither in conformity with GAAP, nor was the financial information a "fair representation" of its financial condition.

Basin's Improper Revenue Recognition From Transaction with Shaw

149.    Basin improperly recognized revenue relating to a transaction with Shaw during the year ended December 31, 2006.[15] Net revenue of $2.5 million (over 14.6% of total revenue for the year) was improperly recognized as of December 31, 2006. An additional $0.2 million relating to the transaction was improperly recognized as revenue between January 1, 2007 and August 8, 2008.

---

[15] Shaw Environmental and Infrastructure, Inc. is a wholly-owned subsidiary of the Shaw Group, Inc.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

150.     On December 23, 2005, Basin and Shaw signed a sales commitment letter for the sale and purchase of certain Basin arsenic ion exchange units totaling $5 million ("the Commitment Letter").[16] The Commitment Letter, which was a letter drafted by Basin, basically consisted of two parts. The initial transaction consisted of the immediate purchase of three standard arsenic 1,000 gpm regenerable ion exchange Basin units at a purchase price of $758,550 per unit, for a total of $2,275,650 due no later than December 31, 2007. The Commitment Letter also stated that if sales of these units were made to Shaw's customers prior to December 31, 2007, the remaining balance would be paid to Basin as the sales occur.

151.     The second part of the transaction stated that Shaw was to purchase an additional $2,724,350 in Basin ion exchange units during the 2006 calendar year, for a total purchase of $5 million including the three units from the initial transaction as described in the preceding paragraph (i.e., $2,275,650 + $2,724,350 = $5,000,000). Upon execution of each purchase order placed by Shaw for the additional units in 2006, a partial payment was to be made by Shaw to Basin. The remaining payment for each purchase order was to be paid no later than twelve months from the date of the purchase order, but in no event beyond December 31, 2008. If sales of these units were made to Shaw's customers prior to December 31, 2008, the remaining balance would be paid to Basin as the sales occur.

---

[16] Basin refers to this December 23, 2005 letter as "a Sales Commitment Letter" in the Form 8-K

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

152.     Pursuant to the Commitment Letter, Basin granted warrants to Shaw to purchase 300,000 shares of Basin common stock at $7.00 per share. For each $1 million paid in cash by Shaw to Basin toward the purchase of Basin's groundwater treatment system units, 20% of the warrants would vest and become exercisable. Basin's Form 10-K for the year ended December 31, 2006 states, "As of December 31, 2006, no shares had vested under the Shaw warrant." The same disclosure, except relating to 2007, is made again in the Form 10-K for the year ended December 31, 2007. No shares had vested under the warrants because the only payment Basin received from Shaw was an initial down payment of $0.2 million made on December 29, 2005.

153.     Basin improperly recorded revenue of $2.9 million on the Commitment Letter as of December 31, 2006. This was offset by almost $0.4 million in warrants, resulting in net revenue of $2.5 million – over 14.6% of total revenue in 2006 – improperly recognized in 2006 pertaining to the Commitment Letter.[17] An additional $0.2 million was improperly recognized between January 1, 2007 and the end of August 8, 2008. Defendants claim that Shaw owed $4.7 million by September 2008. By the end of December 31, 2006, only $4.5 million had been

filed with the SEC on September 22, 2008.

[17]  Basin also improperly recognized revenue during 4Q05 relating to the same transaction. Specifically, Basin recorded revenue of $1.6 million on the Commitment Letter as of December 31, 2005. This was offset by $0.2 million in warrants, resulting in net revenue of $1.4 million recognized in 4Q05 pertaining to the Commitment Letter. Factoring in the $0.2 million down payment, Basin's net revenue was overstated by $1.2 million in 2005.  Thus, at least 9.8% of Basin's revenue for the year, and 32% of the total Commitment Letter value, was generated the last week of 2005 pursuant to this one transaction, despite work on the project not starting until

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

recognized as revenue. Therefore, the additional $0.2 million must have been recognized subsequently.

154.    The revenue on the Commitment Letter was improperly recognized in 2006 in violation of GAAP and SEC rules. GAAP mandates that revenue not be recognized until it is realized or realizable and earned and all of the following criteria have been met: "[p]ersuasive evidence of an arrangement exists, [d]elivery has occurred or services have been rendered, [t]he seller's price to the buyer is fixed or determinable, and [c]ollectibility is reasonably assured." See Statement of Financial Accounting Concepts ("SFAC") No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, ¶¶83-84 and SEC Staff Accounting Bulletin ("SAB") No. 104, Topic 13A.

//

//

Price Was Not Fixed or Determinable

155.    Although the timing of potential payments may have been set forth, the Commitment Letter was not a complete agreement as it went on to state: "Size, configuration and contaminant requirements to be identified during the year 2006." [Emphasis added.] Thus, the equipment specifications were unknown at the time the letter was signed and there is no evidence that the specifications were identified subsequently. Such requirements would likely affect the per unit purchase price, as

January 2006 according to Jensen.

evidenced by the fact that the per unit purchase price of $758,500 for each of the three standard arsenic 1,000 gpm regenerable ion exchange units subject to the initial transaction does not go into $2,724,350 (the value placed on the second part of the transaction) evenly, and further evidenced by the fact that Shaw ultimately disputed the payments. Furthermore, under the "Other Provisions" section of the letter, it is stated that a definitive purchase agreement was still forthcoming:

> Definitive Purchase Agreement – A Definitive Purchase Agreement (the "Purchase Agreement") will be drafted and will be in a form customary for transactions of this type and will include, in addition to the matters set forth in this letter, customary representations, warranties, indemnities, covenants and other matters subject to review by the Buyer and their counsel. The agreements will be drafted under the laws of the State of California and all claims associated with the Purchase Agreement will be dealt with in the State of California.

156.    It does not appear that such a definitive purchase agreement signed by both parties was ever prepared or finalized. This also shows that the Commitment Letter was not customary for that type of transaction.

157.    The lack of a final binding agreement with all specifications substantially determined and with a fixed or determinable price agreed to by both parties precluded revenue recognition under GAAP.

Delivery Had Not Occurred

158.    In addition to not having a final binding agreement with a fixed or determinable price agreed to by both parties, Basin also violated the basic accounting standards governing revenue recognition several other ways. For one, Basin improperly recognized revenue despite the fact that delivery had not

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

occurred, and thus, Basin had not "substantially accomplished what it must do to be entitled to the benefits represented by the revenues." See SFAC 5 ¶83. Topic 13A of SAB 104 further states, "Delivery generally is not considered to have occurred unless the product has been delivered to the customer's place of business or another site specified by the customer. If the customer specifies an intermediate side but a substantial portion of the sales price is not payable until delivery is made to a final site, then revenue should not be recognized until final delivery has occurred."

159.    Nothing shipped after the IPO in May 2006 was intended for Shaw. On several occasions in the two quarters immediately prior to the Company's IPO, finished systems were shipped to a so-called "shipping yard" rented by Basin in San Dimas, CA, instead of to the intended customer's site. With these systems, it was ordinarily the case that completed systems were sent directly to the location where they were to be installed. A total of at least five systems (i.e., two or three each quarter) were shipped to the San Dimas shipping yard and that these systems were intended for Shaw.

160.    About four systems purportedly for Shaw were shipped to a storage facility in San Dimas, CA. Collectively, these four systems represented revenue for Basin of approximately $2 million.

161.    As delivery had not occurred, defendants' recognition of revenue was in violation of GAAP.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

Collectability Not Reasonably Assured

162.     Defendants also violated SAB 104 and other GAAP standards by recognizing revenue despite collectability not being reasonably assured. As of December 31, 2006, only $0.2 million of the $5 million had been collected. The $0.2 million represented an initial down-payment made by Shaw on December 29, 2005. As over twelve months had passed without any additional payment and $2.7 million was not due until as late as December 31, 2008 (an additional two years into the future), the likelihood of collection was questionable and defendants should not have recorded gross revenue of $2.9 million. Additionally, Shaw had not made any of the partial payments that the Commitment Letter required for the $2.7 million of purchase orders that were to be placed in 2006. In sum, Basin had not collected the money it was expecting to receive in 2006 under the Commitment Letter. Therefore, defendants had no basis to believe that collectibility was reasonably assured and should not have recognized revenue in or after 2006.

163.     GAAP requires that revenues represent actual or expected cash inflows and that revenues are not realizable unless "[c]ollectibility is reasonably assured." See SFAC No. 6, Elements of Financial Statements ¶79, and SAB No. 104, Topic 13A. Basin and defendants violated this standard.

Commitment Letter Ultimately Terminated

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

164.     On September 22, 2008, Basin finally disclosed that approximately $4.7 million had been in dispute, resulting in the termination of the Commitment Letter with Shaw. The settlement agreement between Basin and Shaw, dated September 18, 2008, states:

> [I]n an effort to settle the outstanding dispute Shaw E&I proposes to sell Basin Water certain assets of Shaw E&I's water treatment business, including assets related to bioreactors and biofilters, for consideration of $1.5 million (subject to adjustment for work in progress) to be paid in cash by Basin Water to Shaw . . . pursuant to a separate Asset Purchase Agreement dated September 18, 2008 . . . plus Shaw relinquishing whatever claims to or rights it may have in the water treatment systems . . . and resolution of all remaining claims under the National Sales Arsenic Sales Agreement, the December Agreement and related documents.

165.     Thus, not surprisingly, Basin was ultimately never paid by Shaw. This further emphasizes that Basin's net revenue recognition of $2.5 million in 2006 and of $0.2 million thereafter was improper for all of the reasons set forth in the preceding paragraphs.

Basin's Purported "Sale" of 10 Water Systems Under Money-Losing Legacy Contracts

166.     In 2Q07, Basin recorded $3.9 million in revenue from the purported "sale" of 10 water systems in June 2007, to a new customer, VL Capital. According to Basin, most or all of the 10 systems were subject to "legacy" service contracts in which Basin's costs substantially exceeded the revenues that could be generated by the contracts. These water systems were built for specific customers in order to treat water under service contracts, and in the future, would continue to be used for the same purposes.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

167.    Under the agreement with VL Capital, the monthly operating lease payments – previously due to Basin from water districts and municipalities over 5 to 10 years – would now be paid to VL Capital. VL Capital, in turn, agreed to make payments to Basin over a similar period (June 2007 to March 2014, nearly seven years). In connection with the transaction, Basin received from VL Capital a Note Receivable with a "present value" of $3.4 million and $500,000 in cash.[18]

168.    As a result of this transaction, the substance of the initial operating leases for the 10 water systems did not change. The intended purposes for the water systems were the same, as Basin would: (a) continue to treat water for specific customers; and (b) continue to service the water systems under the original service terms. Thus, Basin still had obligations under the leases. The customers that contracted for the systems would: (i) continue to make monthly payments under operating leases; and (ii) continue to make monthly payments under service contracts. The water systems themselves would: (a) remain in their original locations; and (b) continue to be operated in the originally intended manner. The period over which Basin would receive monthly payments (nearly seven years) was approximately the same. More importantly, until March 2014 (when the last payment from VL Capital is due), Basin will continue to be at risk for non-payment, just as it did when it was the owner. In substance, for revenue recognition

---

[18] Generally, the "present value" is the amount of future payments after deducting interest included in the payments. In this example, the "present value," plus the $500,000 in cash, should have been recognized as revenue ratably over the term of the lease, rather than entirely at lease

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

purposes under GAAP, Basin's earnings process on the 10 water systems did not change. Simply interjecting a third-party did not change the substance of the leases or Basin's risk.

**Basin Prematurely Recognized $3.4 Million in Revenue from Continuing Monthly Payments Due Under Long-Term Financing of Water Systems**

169.     Despite the fact that the transaction described above did not, in substance, alter Basin's earnings process under GAAP, in 2Q07, Basin improperly recorded revenue of $3.9 million, the present value of all payments due from VL Capital (the $500,000 down payment in June 2007, plus 72 additional payments from April 2008 through March 2014).

170.     According to Statement of Financial Accounting Standard No. 13, Accounting for Leases ("SFAS No. 13"):

> The sale of property subject to an operating lease, or of property that is leased by or intended to be leased by the third-party purchaser to another party, shall not be treated as a sale if the seller or any party related to the seller retains substantial risks of ownership in the leased property.
>
> \*        \*        \*
>
> If a sale to a third-party of property subject to an operating lease or of property that is leased by or intended to be leased by the third-party purchaser to another party is not to be recorded as a sale because of the provisions of paragraph 21 above, the transaction shall be accounted for as a borrowing. (Transactions of these types are in effect collateralized borrowings.) The proceeds from the "sale" shall be recorded as an obligation on the books of the "seller."

¶¶21-22.

171.     According to the provisions of SFAS No. 13, Basin should have deferred at least $3.4 million in revenue and recorded an obligation (a liability) in

inception.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

that amount. Basin could not record a completed sale in connection with this transaction because the water systems sold: (a) were previously subject to an operating lease; and/or (b) would be leased to others by VL Capital. As such, Basin did not meet the lessor criteria required for treatment as a sale (a "sales-type lease," in GAAP parlance).

172.    According to GAAP, in substance and for accounting purposes, Basin's 2Q07 transaction was not a sale but a "borrowing" by VL Capital, financed by Basin. As such, revenue should have been recorded ratably over the lease term of nearly seven years (June 2007 through March 2014).

173.    Instead of recording the future service obligation of at least $3.4 million, Basin improperly wrote-off the water systems from its balance sheet – approximately $3.4 million in depreciable property – in violation of GAAP. The unrecorded obligation represented deferred revenue that was required to be recognized ratably over the lease term under GAAP.

174.    In addition, in 2Q07, Basin recorded gross profit and net income of $500,000 – the amount by which the $3.9 million in recorded revenue exceeded the $3.4 million book value of the water systems. In recognizing this profit, Basin violated even more basic revenue recognition criteria that prohibit revenue recognition before revenue is earned and realizable, including SFAC Nos. 5 and 6 and SAB No. 104. Basin was responsible for continuing to treat water for specific

customers and continuing to service the water systems under the original service terms. Defendants improperly prematurely recognized all of the revenue in one lump sum despite the fact that Basin had not yet "substantially accomplished what it must do to be entitled to the benefits represented by the revenues" in violation of GAAP. See SFAC 5, ¶83.

175.    Under GAAP, Basin's potential future profit of $500,000 should have been recognized over the lease term of 27 quarters as the services were performed (less than $20,000 per quarter); assuming Basin collected all 72 payments due through March 2014. Further, in 2Q07, Basin earned less than one-third of $20,000, as the transaction occurred in June, the final month of the quarter.

176.    Furthermore, collectibility from VL Capital was not reasonably assured as required by GAAP for purposes of revenue recognition. See SAB 104 and SFAC 6, discussed infra. It appears that VL Capital was incorporated in Delaware on the last business day of the second quarter of 2007. There is no proof of any operating history, not even a Dun & Bradstreet rating.[19]

177.    As a result of Basin's GAAP and SEC violations, Basin's 2Q07 income statement overstated revenue by $3.4 million (52%), and gross profit and net income by $500,000 each (1,900% and 28%, respectively). In addition, Basin's 2Q07 balance sheet understated liabilities (deferred revenue) by $3.4 million (262%).

Basin Falsely Claimed that the Source of $3.4 Million in Negative Cash Flow Was Basin's Investing Activities Rather than Its Operating Activities

178.     In 2Q07 and in 3Q07, Basin improperly reported the June 2007 writeoff of 10 water systems from Basin's balance sheet as negative cash flow from investing activities. This was materially false and misleading and helped conceal Basin's failing operations. Defendants knew the $3.4 million in negative cash flow associated with the note receivable from the purported "sale" of the leases, from which defendants recognized operating revenue, needed to be classified under operating activities and not investing activities in the Statements of Cash Flows, as set forth below.[20]

179.     Statements of cash flows, like balance sheets and income statements, are required for financial reporting in conformity with GAAP. See Statement of Financial Accounting Standards No. 95, Statement of Cash Flows, ("SFAS No. 95"), ¶¶1-3. In fact, the statement of cash flows is an integral part of financial statements. According to Statement of Financial Accounting Concepts No. 1, "Objectives of Financial Reporting by Business Enterprises:

> To managers, the cash flows of a business enterprise are a significant part of their management responsibilities, including their accountability to directors and owners. Many, if not most, of their decisions have cash flow consequences for the enterprise. Thus, investors, creditors, employees, customers, and managers significantly share a common interest in an enterprise's ability to generate favorable cash flows. Other potential users of financial information share the same interest, derived from investors, creditors, employees, customers,

---

[19] Dun & Bradstreet is a provider of credit information on businesses and corporations worldwide. It has been a commercial credit business for over 167 years and widely used.

[20] Perhaps defendants' failure to classify this under operating activities illustrates that defendants knew the underlying transaction was not really a "sale,"but instead was a borrowing as defined by SFAS 13 ¶22, as described herein.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

or managers whom they advise or represent or derived from an interest in how those groups (and especially stockholders) are faring.

¶25. In addition:

Purpose of a Statement of Cash Flows

The primary purpose of a statement of cash flows is to provide relevant information about the cash receipts and cash payments of an enterprise during a period.

The information provided in a statement of cash flows, if used with related disclosures and information in the other financial statements, should help investors, creditors, and others to (a) assess the enterprise's ability to generate positive future net cash flows; (b) assess the enterprise's ability to meet its obligations, its ability to pay dividends, and its needs for external financing; (c) assess the reasons for differences between net income and associated cash receipts and payments; and (d) assess the effects on an enterprise's financial position of both its cash and noncash investing and financing transactions during the period.

To achieve its purpose of providing information to help investors, creditors, and others in making those assessments, a statement of cash flows should report the cash effects during a period of an enterprise's operations, its investing transactions, and its financing transactions. Related disclosures should report the effects of investing and financing transactions that affect an enterprise's financial position but do not directly affect cash flows during the period. A reconciliation of net income and net cash flow from operating activities, which generally provides information about the net effects of operating transactions and other events that affect net income and operating cash flows in different periods, also should be provided.

SFAS No. 95, ¶¶4-6.

180.     By design, the Statement of Cash Flows shows all sources and uses of cash during a period within one of the following three categories: cash flows from operating activities, cash flows from investing activities and cash flows from financing activities. Of the three categories, operating activities is by far the best indicator of a company's ability (or lack thereof) to generate positive cash flows from its business operations.

181.    According to SFAS No. 95, "Certain cash receipts and payments may have aspects of more than one class of cash flows. . . . If so, the appropriate classification shall depend on the activity that is likely to be the predominant source of cash flows for the item. . . . [e]quipment sometimes is acquired or produced to be used by the enterprise or rented to others for a short period and then sold. In those circumstances, the acquisition or production and subsequent sale of those assets shall be considered operating activities." Id. at ¶24.

182.    Thus, under GAAP, cash flows related to property used directly in the generation of revenue are reported as operating cash flows; while cash flows related to property used indirectly in the generation of revenue are treated as investing cash flows. To illustrate, cash flows for vehicles in the rental fleet of a car rental company are operating cash flows; whereas cash flows for vehicles provided to the company's management and other personnel are investing cash flows. Because Basin's water systems were used directly in generating revenue for Basin, the associated cash flows were to be reported as operating cash flows.

183.    In fact, in its year-end 2007 financial statements Basin admitted that its 2Q07 and 3Q07 statements of cash flows were materially misstated. Specifically, rather than correct its $3.4 million overstatements of cash flows from operations in 2Q07 and 3Q07, Basin's statement of cash flows for the full year 2007 introduced other financial reporting errors: A line item called "Issuance of

notes receivable" was added to cash flow from operating activities, in the amount of negative $3.4 million; and the previously reported "Issuance of notes receivable" listed as an investing activity was reduced to $0.

184.    Investors often analyze cash flow statements on a quarterly basis. Because Basin had previously reported "Issuance of notes receivable" in its 2Q07 and 3Q07 statements of cash flow as negative cash flow from investing activities but not its 2007 year end statement of cash flows, this gave the misleading appearance that during 4Q07, Basin had collected the initial $3.4 million note receivable from investing activities and executed another note related to operating activities, when in fact, Basin had made a multi-million dollar error which was improperly "corrected." Despite this misleading appearance, however, Basin did not collect the original $3.4 million negative investing cash flow. This error was material.[21]

185.    As a result of Basin improperly reporting a reversal of issuance of notes receivable from investing activities, Basin's 2Q07 and 3Q07 financial statements are inconsistent with its year end financial statements. In addition, because Basin did not correct its interim $3.4 million errors until year end, its 2Q07

---

[21] Its amendment on Form 10-Q/A for a $304,000 cash flow error shows that Basin felt that error was sufficiently material to correct. However, Basin's December 7, 2007 correction was favorable to Basin, in that it decreased reported negative cash flows from operating activities. Basin's failure to make a correction to amend its Forms 10-Q for 2Q07 and 3Q07 for an error that was 10 times as large – but was unfavorable to Basin – is strong additional evidence of defendants' scienter.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

and 3Q07 financial statements will not be comparable with its 2Q08 and 3Q08 financial statements.

186.    As a result of Basin's GAAP and SEC violations, Basin's 2Q07 and 3Q07 statements of cash flows overstated net cash used in operating activities by $3.4 million (163% in 2Q07), and understated net cash used in investing activities by $3.4 million (60% in 3Q07).

//

//

Basin Failed to Disclose Material Contingent Liabilities with Respect to Large Legacy Contracts, Even Though Defendants Knew that Smaller Legacy Contracts Had Incurred Substantial Operating Losses Prior to and During the Relevant Period

187.    GAAP defines a contingency as "an existing condition, situation, or set of circumstances involving uncertainty" as to possible gain or loss "that will ultimately be resolved when one or more future events occur or fail to occur." Statement of Financial Accounting Standards No. 5 ("SFAS No. 5"), Accounting for Contingencies, ¶1. For example, collection of receivables is a loss contingency.

188.    As provided by SFAS No. 5, businesses are responsible for recording contingent losses, to the extent they are both (a) probable; and (b) can be reasonably estimated. SFAS No. 5, ¶¶8(a) and 8(b), respectively. Further,

> If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 are not met, or if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made. . . .

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

For example, disclosure shall be made of any loss contingency that meets the condition in paragraph 8(a) but that is not accrued because the amount of loss cannot be reasonably estimated (paragraph 8(b)).

SFAS No. 5, ¶10.

189.    SFAS No. 5 states that disclosure of contingent liabilities is required under ¶10 when there is a "reasonable possibility" that a loss may occur even though information may not indicate the loss is probable. Id.

190.    During the Relevant Period, (as is routine for all companies) Basin included a line item entitled "Commitments and Contingencies" on its balance sheet, between total liabilities and Stockholders' equity. It was maintained at a 250 balance throughout the Relevant Period.

191.    However, despite the basic disclosure requirements for contingent liabilities set forth above, Basin made no further disclosures in the 3Q06 10-Q, 1Q07 10-Q and 2Q07 10-Q. By failing to make any further disclosure, Basin essentially assured investors that its exposure to material contingencies outside the ordinary course of business was not "reasonably possible." This was false and a violation of GAAP and SEC rules, as set forth herein.

192.    In these circumstances, investors expect and GAAP and the SEC require that if there was a "reasonable possibility" that Basin's existing contract loss reserve was not adequate to cover losses on systems not yet in operation, Basin would affirmatively warn investors about this specific contingency. Although Basin's silence on the matter falsely reassured investors, this reflects Basin's

contempt for its disclosure responsibilities under SFAS No. 5 and other long-standing GAAP and SEC disclosure requirements, such as Accounting Principles Board Opinion No. 28, Interim Financial Reporting, ¶22; SOP 94-6 and Reg. S-K, Item 303.

193.    Basin not only failed to warn investors that contract losses on systems becoming operational in the Summer of 2007, were not only "reasonably possible," but potentially devastating in scope and had not been disclosed that in the 4Q06 Reserve, contrary to defendants' statements. Losses from these undisclosed contingent liabilities, recorded in 3Q07 were disclosed to be $5 million, substantially larger than the initial contract losses recorded in 4Q06. When this hidden contingency was disclosed, investors were surprised, both by the fact and the amount of this previously undisclosed risk.

Basin's False and Omitted Disclosures Caused Its Financial Statements to Be Materially Misleading

194.    In addition to its undisclosed cash flow statement errors and undisclosed contingent liabilities, Basin's financial statements included other wholesale omissions of required disclosures that helped conceal the accounting fraud described herein. Basin omitted numerous basic disclosures that are necessary to prevent financial statements from being misleading, including, at a minimum, specific disclosures for: (i) revenue recognition under percentage-of-completion accounting; (ii) material balances and components of construction in progress; (iii)

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

material balances and components of property and equipment; (iv) disclosures by lessors of sales-type leases and operating leases; and (v) disclosures of significant trends and uncertainties. Examples of Basin's omissions of required disclosures include: (a) With respect to revenue recognition under percentage-ofcompletion accounting, Basin failed to disclose (see, e.g., SOP 81-1, Accounting for Performance of Construction-Type and Certain Production-Type Contracts ¶¶21, 45, 82, 84): (i) Policies for combining and segmenting construction contracts; and (ii) The method(s) used to measure progress toward completion with respect to labor costs, installed vs. uninstalled equipment costs, etc.; (b) With respect to construction in progress, Basin failed to disclose (see, e.g., ARB No. 43, Restatement and Revision of Accounting Research Bulletins, Chapter 3A and the AICPA Audit & Accounting Guide for Construction Contractors, Chapter 6, "Financial Statement Presentation"): (i) A classified balance sheet showing construction-in-progress segregated between those with more than one year remaining and those with one year or less remaining; (ii) Liquidity characteristics about specific construction projects including retentions receivable and payable, amounts due after one year and the approximate timing of expected future payments; (iii) Costs and earnings in excess of billings, and/or deferred contract costs, and/or billings in excess of costs and estimated earnings; (c) With respect to property and equipment Basin failed to disclose (see, e.g., Accounting Principles

Board Opinion No. 21, Omnibus Opinion, ¶5): (i) Completed systems in service (including accumulated depreciation and book value); (ii) The book value of property not subject to depreciation (e.g., not in service); (iii) Segregated asset balances (property, plant and equipment) for assets used in revenue-generating activities (such as water systems) and nonrevenue generating activities; (d) With respect to its leases, Basin failed to disclose (see, e.g., SFAS No. 13, ¶23): (i) The gross amount and remaining book value of property leased under sales-type leases; (ii) The gross amount and remaining book value of property leased under operating leases; (iii) A description of the terms and conditions of material subleases on leased property; (iv) Unguaranteed residual values of leased assets; and  (v) A description of the terms and timing of payments, including imputed or included interest and showing the gross minimum lease payments, net minimum lease payments and remaining present value of minimum lease payments; and (e) With respect to significant trends and uncertainties, Basin failed to disclose (see, e.g., SOP 94-6, Disclosure of Significant Risks and Uncertainties, ¶13; see also SFAS 5, ¶11; see also SEC Regulation S-K, Item 303): (i) Prior to the issuance of its 2Q07 and 3Q07 financial statements, Basin knew of the possibility that: (a) its contract loss reserve was not sufficient to account for losses on contracts which lacked operating data; and (b) that the impact would be material;

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

195.     Certain of these disclosures are required in all of Basin's financial statements and other disclosures are only required in annual financial statements. Each of the annual disclosures was required to have been made in Basin's 2006 Form 10-K, which was filed with the SEC in March 2007, and Basin's 2007 Form 10-K which was filed with the SEC in March 2008.

Basin's Financial Statements Violated Fundamental Concepts of GAAP and SEC Guidance

196.     In addition the above referenced departures from GAAP and SEC guidance, as a result of the defendants' accounting improprieties, Basin presented its financial results in a manner that violated GAAP and SEC guidance, including the following fundamental accounting principles and SEC guidance: (a) The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users of the financial reports in making rational investment, credit, and similar decisions (FASB Statement of Concepts No. 1, ¶34); (b) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (Id. at ¶40); (c) The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

assess the prospects of an enterprise. Thus, although decisions reflect investors'
expectations about future enterprise performance, those expectations are commonly
based, at least partly, on evaluations of past enterprise performance (Id. at ¶42); (d)
The principle that financial reporting should provide information about how
management of an enterprise has discharged its stewardship responsibility to
owners (stockholders) for the use of enterprise resources entrusted to it. (Id. at ¶50);
(e) The principle that financial reporting should be reliable in that it represents what
it purports to represent. That information should be reliable as well as relevant is a
notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);
(f) The principle of completeness, which means that nothing is left out of the
information that may be necessary to insure that it validly represents underlying
events and conditions (Id. at ¶79); (g) The principle that conservatism be used as a
prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent
in business situations are adequately considered (Id. at ¶95); and (h) The principle
that revenues and gains should not be recognized until they are both earned and
realizable (FASB Statement of Concepts No. 5, ¶83).

## INSIDER TRADING

197.    Defendants were motivated to materially misrepresent the true
financial condition of the Company because it enabled Basin insiders to sell
millions of dollars of their privately held Basin shares while in possession of

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

material adverse non-public information about the Company. Jensen sold 330,000 shares of Company stock at artificially-inflated prices for proceeds of over $2.9 million during the Relevant Period.[22]

| First Name | Last Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| PETER | JENSEN | 12/12/2006 | 25,000 | $6.41 | $160,250 |
| | | 12/12/2006 | 25,000 | $6.41 | $160,250 |
| | | 2/20/2007 | 57,281 | $8.00 | $458,248 |
| | | 2/21/2007 | 42,719 | $8.00 | $341,752 |
| | | 7/2/2007 | 15,400 | $9.00 | $138,600 |
| | | 7/3/2007 | 14,951 | $9.01 | $134,709 |
| | | 7/5/2007 | 69,649 | $9.03 | $628,930 |
| | | 7/16/2007 | 32,110 | $10.00 | $321,100 |
| | | 7/17/2007 | 7,890 | $10.00 | $78,900 |
| | | 7/19/2007 | 40,000 | $12.72 | $508,800 |
| Total | | | 330,000 | | $2,931,539 |

## DEMAND IMPROPERLY DENIED ALLEGATIONS

198.   Plaintiff brings this action derivatively in the right and benefit of Basin Water to redress injuries suffered and to be suffered by the Company as a result of the breaches of fiduciary duty by the Individual Defendants.

199.   Plaintiff will adequately and fairly represent the interests of Basin Water and its shareholders in enforcing and prosecuting its rights.

200.   Plaintiff is the owner of Basin Water common stock and was an owner of Basin Water at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

---

[22] According to Basin's Form 8-K dated December 11, 2006, "Pursuant to the stock trading plan adopted by Mr. Jensen, the sale of up to 400,000 shares of Basin Water common stock currently beneficially owned by him may occur at minimum prices ranging from $8.00 to $18.00 per share. The earliest any sale may occur under Mr. Jensen's plan is one month after the effective date of the plan, and the term of such plan is one year." The stock trading plan had no restrictions on the timing of Jensen's sales other than setting the earliest a sale may occur.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

201.     Plaintiff, through counsel, made demand on Basin Water's Board to investigate these and other issues, on January 17, 2008.   See Exhibit A, incorporated herein.

202.     In response, Scott Hamilton, General Counsel of Basin Water, sent a letter indicating that Basin Water's directors and officers would "continue to act in furtherance of the shareholders' best interests."   See Exhibit B, incorporated herein.

203.     Plaintiff, through counsel, made a second demand on Basin Water's Board to investigate these and other issues on February 11, 2009, and requested that they be apprised of the investigation and contribute towards same.   See Exhibit C, incorporated herein.

204.     Plaintiff, through counsel, again corresponded with counsel for Basin Water on March 5, 2009 and inquired whether Basin Water would involve Plaintiffs in the Board's deliberations or be responding to the shareholder demand prior to Plaintiff initiating litigation.   See Exhibit D, incorporated herein.   Basin Water, through counsel, responded that the Audit Committee of the Board commenced an internal investigation which was completed on October 29, 2008 with a finding that certain transactions in 2006 and 2007 had been incorrectly accounted for.   However, the Audit Committee did not initiate any action to recover anything for the damages suffered by the Company.   Further, Basin Water's

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

Board's and its Committee's refusal to give Plaintiff an opportunity to participate in or review the Audit Committee investigation to determine whether there is sufficient evidentiary support for the conclusion reached, and whether the investigation itself was conducted independently, adequately and in good faith.

205.     Basin Water has failed to substantively respond to Plaintiff's demand, and, to this date, has refused to provide or accept any information from Plaintiff.  Plaintiff is not aware of any special committee formed to investigate the allegations contained herein or any action commenced by the Company to recover damages suffered due to the Individual Defendants' acknowledged wrongful acts.

206.     At the time the initial demand was made, the Board consisted of seven (7) members: Defendants Peter L. Jensen ("Jensen") (former Chairman of the Company's Board and Chief Executive Officer of the Company), Keith R. Solar ("Solar") (Chairperson of the Company's Compensation and Nominating and Governance Committees), Victor J. Fryling ("Fryling") (Chairperson of the Company's Audit Committee and member of the Compensation Committee), Russell C. Ball, III ("Ball") (member of the Company's Audit and Nominating and Governance Committees), Roger S. Faubel ("Faubel") (member of the Company's Compensation and Nominating and Governance Committees), Scott A. Katzmann ("Katzmann") (member of the Company's Audit, Compensation and Nominating and Governance Committees) and Stephen A. Sharpe ("Sharpe") (member of the

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

Company's Audit Committee).    The refusals by the Board to acknowledge Plaintiff's demand or to pursue input from Plaintiff, particularly in light of the damage suffered by the Company, evidences a lack of good faith exercise of the Board's and Committee members' business judgment.

The Members of the Board of Directors Lack Independence

207.    Defendant Director Jensen is the former Chairman of the Board and Chief Executive Officer of the Company, his position at Basin Water was his primary employment.    In 2006, Director Jensen received a base salary of $152,344.00 from the Company.   He was also paid a bonus of $127,385.00 and $28,188.00 in stock awards.   He also received "other compensation in the amount of $43,875.00.   Furthermore, Defendant Jensen exercised 90,000 stock options amounting in a value realized of $593,100.00.   In total, Defendant Jensen received total compensation of $944,892.00 in 2006.   Furthermore, Defendant Jensen and his wife held 2,630,982 shares of Basin Water common stock or 13.22% of Basin Water common stock outstanding in 2006.   Jensen is not considered an independent director of Basin Water because he is beholden to Basin Water due to his employment status with the Company and the financial benefits and lucrative compensation he received from Basin Water as a result of his employment status. Because of this, it is reasonable to conclude that Defendant Jensen lacked the

1
2
3

sufficient independence needed to render a disinterested decision on Plaintiff's demand.

4
5
6
7
8
9
10
11

208.     Defendant Director Scott A. Katzmann is not considered an independent director because of his substantial holdings of Basin Water.  In 2006, Katzmann held 900,554 shares of Basin Water common stock or 4.51% of Basin Water common stock outstanding.  Because of Katzmann's substantial holdings, it is reasonable to conclude that Defendant Katzmann lacked the sufficient independence needed to render a disinterested decision on Plaintiff's demand.

12
13
14
15
16
17
18
19
20
21
22
23
24

209.     Defendant Director Keith R. Solar lacks independence based on his position as a partner of the law firm Alhadeff & Solar LLP[23].  In 2006, Basin Water paid legal fees and reimbursement of costs in the aggregate amount of approximately $192,000.00 to Alhadeff & Solar LLP.  As a partner of Alhadeff & Solar LLP, it is reasonable to conclude that Defendant Solar inevitably received compensation for its services to Basin Water, and such compensation provided outside benefits to Solar.  Because Solar was in a position to receive compensation from Basin Water's relationship with Alhadeff & Solar LLP, he lacks sufficient independence with which to render a disinterested decision on whether to pursue the derivative claims against the Individual Defendants.

25
26

---

[23] On May 31, 2007, Buchanan Ingersoll & Rooney LLP ("Buchanan") announced that the lawyers of Alhadeff & Solar LLP merged into Buchanan in California.  Buchanan has more than 550 attorneys and government relations professionals practicing throughout the United States.

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

210.     Defendants Jensen, Katzmann and Faubel have a pre-existing business and personal relationship evidenced by their previous employment status, respectively, with Western Water Company.  Jensen, while President and Chairman of the Board of Directors of Basin Water, is believed to have introduced Katzmann and Faubel to the Board of Directors of Basin Water as candidates.  From 1990 to 1998, Jensen was Chief Executive Officer and President, and Chairman of the Board of Directors of Western Water Company from 1990 to 1999.  In 1997 to 1999, Katzmann served as a Director of Western Water Company.  In June 1997, Faubel joined Western Water Company and became Vice President, Director of Public Affairs of Western Water Company in February 1998.  Because of this, it is reasonable to conclude that they would not authorize suit against each other.

211.     All of the Director Defendants lacked the independence needed to render a disinterested decision on Plaintiff's demands because they face liability for their failure to put in place and monitor a reliable system of financial controls.  In addition, four (4) of the seven (7) Directors at the time of Plaintiff's demand have serious conflicts of interest and entangling relationships that make it impossible for them to render an independent and disinterested decision regarding Plaintiff's demand.

212.     In response to the Demand, the Board failed to form a special committee, retain outside counsel or conduct any investigation whatsoever. The

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

Board simply denied Plaintiff's allegations and refused the Demand without making any good faith effort to determine whether the action demanded was in the best interests of the Company.

213.     In light of the Board's utter and complete failure to investigate Plaintiff's Demand or take any action against the Individual Defendants, the Board has demonstrated that is unable or unwilling to act in good faith with regard to the claims asserted herein. The refusal to substantively respond to Plaintiff's demand evidences a lack of good faith exercise of the Board's business judgment.

214.     Basin Water has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above. Such expenditures include, but are not limited to:

        a.  Costs incurred to carry out internal investigations, including accounting fees and legal fees paid to outside counsel and experts;

        b.  Costs and legal fees for defending Basin Water and the individual Director Defendants against securities class action litigation arising from illegal and improper conduct alleged herein; and

        **c.**  Lost opportunities costs.

## FIRST CAUSE OF ACTION

### AGAINST ALL DEFENDANTS FOR
### BREACH OF FIDUCIARY DUTY

215.     Plaintiff incorporates by reference and realleges each of the foregoing allegations, as though fully set forth herein.

- 112 -

216.     The Defendants breached their fiduciary duties to the Company and its shareholders by failing in their responsibility to maintain adequate procedures and controls to ensure that the Company complied with federal and state laws and regulations regarding the integrity of the mortgage origination process and by failing to take steps to prevent said violations despite notice of past incidences of same.

217.     The Defendants owed a fiduciary duty to Basin Water to supervise the issuance of its press releases and public filings to ensure that they were truthful and accurate and that they conformed to federal and state securities law.   The Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Basin Water's internal controls and by allowing misleading statements and filings to be issued and made.

218.     The Defendants have engaged, knowingly or recklessly, in a sustained and systematic failure to exercise their oversight responsibilities to ensure that Basin Water complied with federal and state laws, rules and regulations.

219.     As members of the Board of Directors of Basin Water, the Director Defendants were directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices which resulted in violations of the federal securities laws as alleged herein.   Each of them had knowledge of and actively participated in and/or approved of or acquiesced in the wrongdoings alleged herein

or abdicated his/her responsibilities with respect to these wrongdoings.  The alleged acts of wrongdoing have subjected Basin Water to unreasonable risks of loss and expenses.

220.     Each of the Individual Defendants' acts in causing or permitting the Company to misrepresent its true prospects and conceal the improper acts described above and abdicating his/her oversight responsibilities to the Company has subjected the Company to liability for violations of federal and state law, and therefore was not the product of a valid exercise of business judgment and was a complete abdication of their duties as officers and directors of the Company.  As a result of the Defendants' breaches, Basin Water is the subject of major securities fraud class action lawsuits by defrauded investors,  and has had its reputation in the business community and financial markets irreparably tarnished, and has thus been damaged.

## SECOND CAUSE OF ACTION
## CONTRIBUTION AND INDEMNIFICATION

221.     Plaintiff repeats and realleges each and every allegation set forth above.  Basin Water is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to Defendants' liability to Basin Water.

222.     Basin Water's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

the knowing, reckless, disloyal and/or bad faith acts or omissions of the Defendants as alleged above, and Basin Water is entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have been, are or may in the future be asserted against Basin Water by virtue of the Defendants' misconduct.

## THIRD CAUSE OF ACTION

### AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL

223.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

224.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability of control and influence Basin Water, for which they are legally responsible.

225.     As a direct and proximate result of the Individual Defendants' abuse of control, Basin Water has sustained significant damages.

226.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

227.     Plaintiff, on behalf of Basin Water has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANAGEMENT

228.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

- 115 -

229.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Basin Water in a manner consistent with the operations of a publicly held corporation.

230.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Basin Water has sustained significant damages in excess of millions of dollars.

231.     Plaintiff, on behalf on Basin Water, has no adequate remedy at law.

### FIFTH CAUSE OF ACTION

### AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

232.     Plaintiff incorporates by references and realleges each and every allegation set forth above as if set forth fully herein.

233.     As result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused Basin Water to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

234.     As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

235.     Plaintiff, on behalf of Basin Water, has no adequate remedy at law.

## SIXTH CAUSE OF ACTION

### AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

236.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

237.     By their wrongful acts and omission, the Individual Director Defendants were unjustly enriched at the expense of and to the detriment of Basin Water.

238.     Plaintiff, as shareholder and representative of Basin Water, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Directing the Defendants to account to the Company for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

- 117 -

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

B.      Requiring the Defendants to return to Basin Water all salaries and the value of other remuneration of whatever kind paid to them by the Company, and all proceeds of all illegal stock sales, during the time they were in breach of the fiduciary duties they owed to Basin Water;

C.      Directing the Defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of Defendants' culpable conduct;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

E.      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  March 9, 2009          Respectfully submitted,

**BRODSKY & SMITH, LLC**

By_____(SBN 242352)
Evan J. Smith (SBN 242352)


William B. Federman, Esq.
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania
Oklahoma City, OK  73120
Telephone:  (405) 235-1560
Facsimile:   (405) 239-2112

VERIFIED DERIVATIVE SHAREHOLDER COMPLAINT

## VERIFICATION

I, _Demetrice Ledbetter III_ declare that I have reviewed the Complaint ("Complaint") prepared on behalf of Basin Water, Inc., and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Basin Water, Inc. common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

_3/9/09_
Date

_____
(Signature of Investor)

I:\Pending\Basin Water\VerificationBWTR.doc

EXHIBIT A

# FEDERMAN & SHERWOOD

(AN ASSOCIATION OF ATTORNEYS AND PROFESSIONAL CORPORATIONS)

10205 N. PENNSYLVANIA AVENUE
OKLAHOMA CITY, OKLAHOMA  73120
405-235-1560
FACSIMILE: 405-239-2112

2926 MAPLE AVENUE
SUITE 200
DALLAS, TEXAS  75201
214-696-1100
FACSIMILE: 214-740-0112

REPLY TO:   OKLAHOMA CITY, OK

January 17, 2008

***Via Certified Mail, Return Receipt***
Mr. Peter L. Jensen
Chairman of the Board and CEO
8731 Prestige Court
Rancho Cucamonga, CA 91730

Re:    Shareholder Demand on the Board of Directors of Basin Water, Inc.

Dear Mr. Jensen:

The law firm of Federman & Sherwood represents Demetree Ledbetter, a shareholder of common stock of Basin Water, Inc. ("Basin Water" or the "Company"). We write on behalf of our client to demand that the Board of Directors of Basin Water (the "Board") establish a Special Litigation Committee ("SLC") to take action to fully investigate and remedy, *inter alia,* alleged breaches of fiduciary duty by certain current and/or former officers and directors of the Company (collectively referred to herein as the "Individuals").

As you are aware, by reason of their positions as officers and/or directors, and their ability to control the business and corporate affairs of Basin Water, the Individuals owe the Company and its shareholders the fiduciary obligations of good faith, loyalty and due care, and were required to use their utmost ability to control and manage Basin Water in a fair, just, honest and equitable manner.  Our client, who is a common stock shareholder of Basin Water, believes that the Individuals violated these core fiduciary duties by participating in/or permitting the Company's participation in issuing materially false and misleading statements regarding the Company's business and financial results, giving rise to official investigations and lawsuits against Basin Water and causing the Company to suffer present and future damages.

During May 14, 2007, and November 13, 2007, the Individuals failed to properly account for the Company's reserves for its legacy system contracts related to its system sales and water service agreement contracts.  These contracts did not include price escalator clauses, and so the Company was unable to pass on rising costs in a timely manner.   Despite the fact that Basin Water was having difficulty reworking these contracts, the Individuals asserted that the bulk of the issues related to the contracts were resolved.   Furthermore, the Individuals did not implement sufficient internal controls to ensure that the reserves for legacy contracts were receiving the proper accounting treatment. As a result, the Company's projections and reported results were based upon defective assumptions.

January 17, 2008
Page 2

        The Company was forced to record a $4.7 million charge to cost of revenues to reserve for future projected losses. This charge to cost of revenues was in addition to the reserve previously recorded in the fourth quarter of 2006.

        We demand that the Board immediately proceed with an internal investigation of the above allegations. We also demand that, should such a remedy be appropriate, the Board immediately proceed with a civil action against the Individuals and recover for the benefit of the Company: (i) the amount of damages sustained by the Company as a result of the Individuals' breaches of fiduciary duties alleged herein; (ii) all bonuses, reimbursement of expenses, benefits, stock options and any other compensation paid to the Individuals that were improperly granted; and (iii) all costs to the Company associated with the various investigations of the Company, as well as the pending class actions that have been or will be filed against Basin Water for the same allegations described herein.  Such action is clearly in the best interest of the Company.  We also demand that the Board of Basin Water make a claim under the Company's applicable directors' and officers' insurance policies for the amount of these damages.

        If, after receipt of this letter, the Board has not commenced an action as demanded within ninety (90) days, we will seek to initiate litigation on behalf of the Company.  We, of course, are willing to work with the SLC and, subject to a confidentiality agreement, review all reports and information the SLC has developed in addition to notes from interviews conducted by the SLC.

        We look forward to the courtesy of a timely response to this letter.

                                Sincerely,

                                Jennifer F. Sherrill
                                For the Firm

/jfs

February 6, 2008

VIA Facsimile and Regular Mail
(405) 239-2112

Jennifer F. Sherrill, Esq.
Federman & Sherwood
10205 N. Pennsylvania Avenue
Oklahoma City, Oklahoma 73120

Re: Shareholder Demand on the Board of Directors of Basin Water, Inc.

Dear Ms. Sherrill:

I am the General Counsel of Basin Water, Inc., and I write in response to your letter of January 17, 2008 to Peter L. Jenson. Basin's directors and officers embrace their duties to the company. And please be assured that we will continue to act in furtherance of the shareholders' best interests.

We invite your client, Demetree Ledbetter, to share with me any information relating to the belief that a violation of law may have occurred at Basin Water.

Thank you for your interest in our Company.

Best regards,

Scott B. Hamilton

Scott B. Hamilton, Esq.

EXHIBIT B



February 6, 2008

<u>VIA Facsimile and Regular Mail</u>
(405) 239-2112

Jennifer F. Sherrill, Esq.
Federman & Sherwood
10205 N. Pennsylvania Avenue
Oklahoma City, Oklahoma 73120

Re: <u>Shareholder Demand on the Board of Directors of Basin Water, Inc.</u>

Dear Ms. Sherrill:

I am the General Counsel of Basin Water, Inc., and I write in response to your letter of January 17, 2008 to Peter L. Jenson. Basin's directors and officers embrace their duties to the company. And please be assured that we will continue to act in furtherance of the shareholders' best interests.

We invite your client, Demetree Ledbetter, to share with me any information relating to the belief that a violation of law may have occurred at Basin Water.

Thank you for your interest in our Company.

Best regards,

Scott B. Hamilton, Esq.

EXHIBIT C

# FEDERMAN & SHERWOOD

### (AN ASSOCIATION OF ATTORNEYS AND PROFESSIONAL CORPORATIONS)

10205 N. PENNSYLVANIA AVENUE
OKLAHOMA CITY, OKLAHOMA 73120
405-235-1560
FACSIMILE: 405-239-2112

2926 MAPLE AVENUE
SUITE 200
DALLAS, TEXAS 75201
214-696-1100
FACSIMILE: 214-740-0112

REPLY TO:   OKLAHOMA CITY, OK

February 11, 2009

**_Via Facsimile_ (909) 481-6801**
Mr. Scott B. Hamilton, Esq.
Basin Water, Inc.
8731 Prestige Court
Rancho Cucamonga, CA  91730

Re:    Shareholder Demand on the Board of Directors of Basin Water, Inc.

Dear Mr. Hamilton:

Previously, we had served the Board of Directors of Basin Water, Inc. ("Basin Water" or the "Company") with a demand from shareholder Demetree Ledbetter.  A copy of that letter is enclosed.  In response, the Company sent a letter indicating that Basin Water's directors and officers would "continue to act in furtherance of the shareholders' best interests."  That letter is also enclosed.

This letter is to follow up with the assurance that the shareholders' best interests would be considered by Basin Water's officers and directors.  Pursuant to those assurances, please advise whether the Company appointed a Special Committee, or otherwise conducted an investigation into our Demand.

If so, we are requesting that the following information be provided to us:

- The Final Report drafted in connection with any investigation conducted;

- Any documents cited or referenced in the Final Report;

- Notes and/or transcripts of witness interviews conducted in connection with the investigation and any documents summarizing the contents of those interviews;

- The time, in hours, spent conducting the investigation;

- Corporate resolution forming or empowering a Special Committee/Investigation and a copy of the minutes of the Board of Director's meeting wherein Basin Water's Directors appointed a Special Committee or otherwise authorized an investigation of Plaintiff's Demand and all minutes of the Board of Directors wherein any investigative findings were reported; and

I:\BasinWater\Correspondence\LtrHamilton.doc

February 11, 2009
Mr. Scott B. Hamilton, Esq.
Page 2

- All documents reviewed and relied upon by the investigators and/or their consultants when conducting the investigation.

Please also identify the individuals conducting the investigation and identify any prior relationships (business or social) between those individuals conducting the investigation and members of Board of Directors of Basin Water.

In acknowledgement of your cooperation, we agree to enter into a confidentiality agreement concerning the requested information. We look forward to receiving a timely response from you.

Sincerely,

Jennifer F. Sherrill
For the Firm

JFS/

Enclosures

# EXHIBIT D

| | |
|---|---|
| **From:** | Jennifer F. Sherrill |
| **Sent:** | Thursday, March 05, 2009 11:29 AM |
| **To:** | 'mtu@orrick.com'; 'dtyukody@orrick.com' |
| **Cc:** | William B. Federman (WBF) |
| **Subject:** | Shareholder Demand on Basin Water, Inc. |
| **Attachments:** | Complaint.pdf |

Mr. Tu:

Bill Federman of this office recently left you a voicemail message regarding our prior correspondence with the General Counsel for Basin Water.  We initially made a shareholder demand upon Basin's Board of Directors on January 17, 2008.  Scott Hamilton, Basin's General Counsel responded indicating that Basin Water's directors and officers would "continue to act in furtherance of the shareholders' best interests."  We subsequently made a second request on February 11, 2009 and requested that we be apprised of the status of any investigation.  We have not heard anything further.

Please advise if there is any interest in responding to the shareholder demand issues prior to our filing a shareholder derivative action on behalf of Basin.  Attached please find a draft of the Complaint.  We would like a response prior to 5:00 CST on Friday, March 6, 2009.  If we do not have a response by that time, we will presume that you have no interest in responding to our shareholder demand and file the attached Complaint.

Jennifer F. Sherrill
FEDERMAN & SHERWOOD
10205 N. Pennsylvania
Oklahoma City, OK 73120
(405) 235-1560/Fax (405) 239-2112
jfs@federmanlaw.com

**INTERNET EMAIL CONFIDENTIALITY FOOTER:**
**Federman & Sherwood intends that this electronic message be used exclusively by the individual or entity to which it is addressed.  This message may contain information that is privileged, confidential, and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, be aware that any disclosure, dissemination, distribution, or copying of this communication, or the use of its contents, is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone at (405) 235-1560 and delete the original message from your e-mail system.  Thank you.**